# 26-655

## In the United States Court of Appeals
## for the Second Circuit

JAMES LOWE, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED, MICHAEL COLLINS, RAE FULLER,

*Plaintiffs-Appellees,*

v.

MONEYLION TECHNOLOGIES INC. D/B/A MONEYLION,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:25-CV-4098
HON. DALE E. HO

## BRIEF OF DEFENDANT-APPELLANT MONEYLION

JONATHAN Y. ELLIS
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
(919) 755-6688

GRACE GREENE SIMMONS
MCGUIREWOODS LLP
1075 Peachtree Street, NE
35th Floor
Atlanta, GA 30309
(404) 443-5718

EPHRAIM A. MCDOWELL
*Counsel of Record*
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800

JAMES KIM
KAITLAND KENNELLY
HUGH HAMILTON
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

*Counsel for Defendant-Appellant MoneyLion*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, MoneyLion

Technologies Inc. states as follows:

MoneyLion Technologies Inc. is a wholly owned subsidiary of Gen

Digital Inc., which is a publicly traded company.


Dated: June 3, 2026                    Respectfully submitted,

                                       */s/ Ephraim A. McDowell*
                                       Ephraim A. McDowell

                                       *Counsel for Defendant-Appellant*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES..............................................................iv

STATEMENT REGARDING ORAL ARGUMENT................................xii

INTRODUCTION ..............................................................................1

STATEMENT OF JURISDICTION......................................................4

STATEMENT OF ADDENDUM...........................................................5

ISSUES PRESENTED ........................................................................5

STATEMENT OF THE CASE ..............................................................5

    A.    Legal Background.................................................................5

    B.    Factual Background .............................................................8

        1.    Earned Wage Access ...............................................8

        2.    MoneyLion and Instacash Advances......................10

        3.    Agreements Between Plaintiffs and MoneyLion ....13

    C.    Procedural History ............................................................14

SUMMARY OF ARGUMENT.............................................................16

STANDARD OF REVIEW..................................................................19

ARGUMENT.....................................................................................19

    I.    Plaintiffs' Claims Are Arbitrable Because They Do Not Involve The Extension Of Consumer Credit ...........................20

    A.    Instacash Advances Are Not Extensions Of Credit.........21

        1.    "Debt" Requires a Legal or Contractual Obligation to Pay.....................................................22

        2.    Instacash Users Incur No Debt Because They Have No Obligation to Repay Advances. ...............28

        3.    The District Court's Contrary Conclusion Lacks Merit. ....................................................................31

# TABLE OF CONTENTS
## (continued)

**Page**

      B.     Instacash Advances Are Not Subject To A Finance Charge. ............................................................................ 47

           1.     Optional Express Delivery Fees and Tips are Not Finance Charges .................................... 48

           2.     The District Court's Contrary Reasoning Lacks Merit. ......................................................... 57

II.    At Minimum, The MLA Does Not Preclude Arbitration Of Plaintiffs' Non-MLA Claims ...................................... 63

CONCLUSION ....................................................................... 64

CERTIFICATE OF COMPLIANCE ....................................... 66

CERTIFICATE OF SERVICE ............................................... 67

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocate Christ Med. Ctr. v. Kennedy,*
605 U.S. 1 (2025) ................................................................ 45

*Aetna Life Ins. Co. v. Town of Middleport,*
124 U.S. 534 (1888) ........................................................... 26

*In re AgriProcessors, Inc.,*
859 F.3d 599 (8th Cir. 2017) ............................................. 25

*Am. Exp. Co. v. Italian Colors Rest.,*
570 U.S. 228 (2013) ............................................................. 6

*Analytical Survs., Inc. v. Tonga Partners, L.P.,*
684 F.3d 36 (2d Cir. 2012) ................................................ 25

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011) ............................................................. 6

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................... 42

*Burrison v. FloatMe Corp.,*
2026 WL 444638 (D. Mass. Feb. 17, 2026) ...................... 35

*Busch Props., Inc. v. Nat'l Union Fire Ins. Co.,*
815 F.3d 1123 (8th Cir. 2016) ........................................... 49

*CFPB v. MoneyLion Techs. Inc.,*
799 F. Supp. 3d 152 (S.D.N.Y. 2025) ............................... 49

*Clinton Mining & Min. Co. v. Beacom,*
266 F. 621 (3d Cir. 1920) .................................................. 36

*CM, Inc. v. Canadian Indem. Co.,*
635 F.2d 703 (8th Cir. 1980) ............................................. 49

iv

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Davis,*
194 F.3d 570 (5th Cir. 1999) ................................................... 26

*Dewey v. Denson,*
120 S.E. 805 (Ga. 1923) ......................................................... 27

*Dolan v. United States Postal Serv.,*
546 U.S. 481 (2006) ................................................................ 38

*Edmundson v. Klarna, Inc.,*
85 F.4th 695 (2d Cir. 2023) ................................................... 19

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) ........................................................... 6, 63

*Espin v. Citibank, N.A.,*
126 F.4th 1010 (4th Cir. 2025) ............................................. 63

*FCC v. AT&T Inc.,*
562 U.S. 397 (2011) ................................................................ 22

*Feeman v. Bridge It, Inc.,*
2026 WL 880508 (S.D.N.Y. Mar. 30, 2026) ......................... 41

*Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co,*
43 N.E.3d 911 (Ill. 2015) ....................................................... 41

*Hagar v. Reclamation Dist. No. 108,*
111 U.S. 701 (1884) ................................................................ 36

*Household Credit Servs., Inc. v. Pfennig,*
541 U.S. 232 (2004) ......................... 18, 52-54, 56-57, 60-61

*Johnson v. Activehours, Inc.,*
2025 WL 2299425 (D. Md. Aug. 8, 2025) ............................. 35

*Kisor v. Wilkie,*
588 U.S. 558 (2019) ................................................................ 44

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Koch Indus., Inc. v. United States,*
603 F.3d 816 (10th Cir. 2010)..............................................................53

*Lazo v. Sodexo, Inc.,*
931 F.3d 29 (1st Cir. 2019) ..................................................................49

*Lynch v. City of N.Y.,*
952 F.3d 67 (2d Cir. 2020) .............................................................32-33

*In re Marriage of Baumgartner,*
890 N.E.2d 1256 (Ill. Ct. App. 2008) ..................................................27

*McNally v. United States,*
483 U.S. 350 (1987)..............................................................................54

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983) ...................................................................................6

*Moss v. Cleo AI Inc.,*
799 F. Supp. 3d 1152 (W.D. Wash. Sept. 8, 2025).........................35-36

*N.Y. Legal Assistance Grp. v. BIA,*
987 F.3d 207 (2d Cir. 2021) .................................................................61

*Orubo v. Activehours, Inc.,*
780 F. Supp. 3d 927 (N.D. Cal. 2025)...............35, 38, 42-43, 45, 60-62

*Powell v. Ocwen Fin. Corp.,*
173 F.4th 386 (2d Cir. 2026)................................................................25

*Revell v. Grant Money, LLC,*
808 F. Supp. 3d 1036 (N.D. Cal. 2025)..................................... 36, 38, 40

*Roberts v. Sea-Land Servs., Inc.,*
566 U.S. 93 (2012).................................................................................36

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.,*
999 F.3d 828 (2d Cir. 2021) .........................................8, 32-33, 58

vi

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*St. Paul Fire & Marine Ins. Co. v. Nowlin,*
  542 So. 2d 1190 (Ala. 1988) .................................................................. 26

*Stollenwerck v. Marks & Gayle,*
  65 So. 1024 (Ala. 1914) ........................................................................ 26

*In re Taberna Preferred Funding IV, Ltd.,*
  594 B.R. 576 (Bankr. S.D.N.Y. 2018) .................................................. 41

*Turner v. E-Z Check Cashing of Cookeville, TN, Inc.,*
  35 F. Supp. 2d 1042 (M.D. Tenn. 1999) ............................................... 44

*United States v. Brow,*
  62 F.4th 114 (3d Cir. 2023) ................................................................... 49

*United States v. Fort Scott,*
  99 U.S. 152 (1879) ................................................................................ 26

*United States v. Hansen,*
  599 U.S. 762 (2023) .............................................................................. 22

*United States v. Martin,*
  974 F.3d 124 (2d Cir. 2020) ..................................................... 48-49, 51

*United States v. Olano,*
  507 U.S. 725 (1993) .............................................................................. 54

*Util. Air Reg. Grp. v. EPA,*
  573 U.S. 302 (2014) .............................................................................. 53

*Veale v. Citibank, F.S.B.,*
  85 F.3d 577 (11th Cir. 1996) .................................................... 54-55, 59

*Vickery v. Empower Fin., Inc.,*
  2025 WL 2841686 (N.D. Cal. Oct. 7, 2025) ............................. 35, 42, 60

*W. Va. Univ. Hosps., Inc. v. Casey,*
  499 U.S. 83 (1991) ................................................................................ 45

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*West Virginia v. EPA,*
  597 U.S. 697 (2022) .................................................................. 37

**Statutes**

9 U.S.C.
  § 2 .................................................................................................. 6
  § 16(a)(1) ........................................................................................ 5

10 U.S.C.
  § 987 ............................................................................................. 64
  § 987(a) ........................................................................................... 6
  § 987(b) ........................................................................................... 6
  § 987(c) ................................................................................. 6, 45-46
  § 987(c)(1)(B) ................................................................................ 56
  § 987(f)(4) ........................................................... 2, 7, 16, 20, 64
  § 987(h)(2)(D) ................................................................................. 7
  § 987(i)(6) ....................................................................................... 7

11 U.S.C.
  § 101(5)(A) .................................................................................... 24
  § 101(12) ....................................................................................... 24
  § 727(b) .......................................................................................... 38

15 U.S.C.
  § 1601(a) ............................................................................ 8, 45, 56
  § 1602(f) ........................................................................................ 22
  § 1604(a) ........................................................................................ 27
  § 1605(a) ..................................................... 3, 18, 52-53, 56, 61
  § 1638 .............................................................................................. 8
  § 1638(a)(4) ................................................................................... 45
  § 1638(a)(10) ................................................................................. 45
  § 1692a(5) ..................................................................................... 24
  Pub. L. No. 90-321, 82 Stat. 146 (1968) ..................................... 8

26 U.S.C. § 61(a)(11) ........................................................................ 38

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

28 U.S.C.
    § 1331 ..................................................................................... 4
    § 1367 ..................................................................................... 5

Ark. Code § 23-52-203 ............................................................. 46

Ind. Code § 28-8-6-1002(a)(3) ................................................ 46

Kan. Stat. § 9-2407(a)(1)(A) ................................................... 46

La. Stat. § 9:3591.5 .................................................................. 46

Mo. Stat. § 361.749 .................................................................. 46

Nev. Rev. Stat. § 604D.190 ..................................................... 46

S.C. Code § 39-5-860 ............................................................... 46

Utah Code § 13-78-106(1)(b) .................................................. 46

## Rules & Regulations

12 C.F.R.
    pt. 1026, Supp. I, Para. 2(a)(14) ..................................... 43-44
    § 1026.2(a)(13) ............................................................. 25, 36
    § 1026.2(a)(14) .................................................................. 22
    § 1026.4 ......................................................................... 56-57
    § 1026.4(a) ................................................................ 7, 47, 53
    § 1026.4(b) ...................................................................... 56, 61
    § 1026.17(b) ......................................................................... 24

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

32 C.F.R.
  § 232.3(f)(1) ............................................................................ 7, 16, 20
  § 232.3(f)(1)(i) ........................................................................ 3, 18, 47
  § 232.3(g)(1) ....................................................................................... 25
  § 232.3(h) ....................................................................... 3, 7, 16, 22
  § 232.3(n) .................................................................................... 7, 47
  § 232.3(s) ........................................................................................... 24
  § 232.9(d) ..................................................................... 7, 19, 64

Federal Register
  61 Fed. Reg. 49237 (Sept. 19, 1996) .................................................. 61
  68 Fed. Reg. 16185 (Apr. 3, 2003) ............................................... 55-56
  80 Fed. Reg. 43560 (July 22, 2015) .................................................. 37
  90 Fed. Reg. 60069 (Dec. 23, 2025) ........... 8-9, 27-28, 50, 52, 55, 61-62

## Other Authorities

Black's Law Dictionary (4th rev. ed. 1968)
  *Debt* .............................................................................. 23, 27, 31
  *Impose* ............................................................................................ 48
  *Loan* ............................................................................................... 43
  *Necessary* ...................................................................................... 53
  *Obligation* ..................................................................................... 24

Random House Dictionary of the English Language (1969)
  *Debt* ................................................................................................ 23
  *Impose* ............................................................................................ 48
  *Necessary* ...................................................................................... 53
  *Obligation* ..................................................................................... 23

The Earned Wage Access Consumer Protection Act, H.R.,
  119th Cong. (2026) ........................................................................... 46

Webster's New Twentieth Century Dictionary (1965)
  *Debt* ........................................................................................ 23, 37-38

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Webster's Seventh New Collegiate Dictionary (1967)
  *Impose*..................................................................................48
  *Obligation*..............................................................................23

xi

## STATEMENT REGARDING ORAL ARGUMENT

In accordance with Fed. R. App. P. 34(a)(1), defendant-appellant MoneyLion Technologies Inc. (MoneyLion) respectfully requests oral argument. MoneyLion submits that the Court will be aided by oral argument given that the appeal raises a complex question of first impression regarding the interpretation of the Military Lending Act, 10 U.S.C. § 987, and its interaction with the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

## INTRODUCTION

This appeal arises from an erroneous denial of a motion to compel arbitration. Rather than enforcing the parties' arbitration agreement by its terms in accordance with the Federal Arbitration Act (FAA), the district court held that another statute—the Military Lending Act (MLA)—overrode the FAA. That holding rests on multiple legal errors and warrants reversal.

Defendant-appellant MoneyLion Technologies Inc. (MoneyLion) offers an innovative financial service called Instacash, which is a form of earned wage access (EWA). An Instacash advance provides users a portion of their earned wages ahead of the typical two-week payroll schedule, so they can use those funds to cover regular expenses and other costs. But critically, Instacash users have no obligation to repay advances, and MoneyLion has no right to seek recovery of unpaid advances. Nor can it impose late fees, charge interest, or refer unpaid sums to debt collectors. Instead, if a user declines to repay an advance, the only effect is that they cannot obtain further advances unless they repay the current one.

Plaintiffs-appellees allege that they created MoneyLion accounts

1

and obtained Instacash advances while they were active-duty servicemembers. They agreed to arbitrate all disputes with MoneyLion and to adhere to MoneyLion's Instacash Terms and Conditions (Terms). Those Terms made clear that plaintiffs had no obligation to repay Instacash advances and that MoneyLion had no recourse against them if they decided not to repay. The Terms also gave plaintiffs the option of receiving their funds through free standard delivery in 1-5 days or through same-day express delivery for a small fee.

After obtaining Instacash advances, plaintiffs sued MoneyLion, asserting violations of the MLA, Truth in Lending Act (TILA), Georgia Payday Lending Act, and Illinois Predatory Loan Prevention Act. MoneyLion promptly moved to compel arbitration. But the court denied the motion because, in its view, the MLA displaces the FAA. Specifically, the court cited 10 U.S.C. § 987(f)(4), which states that "[n]otwithstanding" the FAA, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered" servicemember. The court's reliance on Section 987(f)(4) was wrong three times over.

*First,* Instacash advances are not "extension[s] of consumer credit"

2

because they do not extend "credit" at all. Under the MLA and its implementing regulations, a putative creditor extends consumer credit only if the consumer incurs "debt." 32 C.F.R. § 232.3(h). The *sine qua non* of "debt" is an obligation to pay a sum of money. Here, Instacash users incur no "debt" because they have no obligation to repay advances; instead, they may walk away with an advance with no strings attached.

*Second*, even if Instacash advances were "credit," they would not be "extension[s] of consumer credit" because they are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). A "finance charge" is a charge "*imposed* . . . by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a) (emphasis added). Plaintiffs assert that both express delivery fees and voluntary tips are "finance charges." But such fees and tips are not "imposed" by MoneyLion on users because they are entirely optional. Users can obtain standard delivery advances at no cost—and such advances arrive significantly faster (within a few days) than waiting until the user's next payday (two weeks). Thus, MoneyLion does not "impose" express delivery fees or tips on users; rather, certain users voluntarily choose to pay express delivery fees to obtain faster access to advances, and some choose to pay tips to show appreciation for the

3

service. That is precisely why the Consumer Financial Protection Bureau (CFPB) recently concluded that optional express delivery fees and tips—just like the ones at issue here—are not "finance charges."

*Third*, at the very least, the district court erred by denying MoneyLion's motion to compel arbitration of plaintiffs' TILA and state-law claims. Section 987(f)(4) of the MLA plainly does not bar arbitration of claims arising under statutes *other than* the MLA.

In denying MoneyLion's motion to compel arbitration, the district court did not grapple with the key statutory terms: "debt" and "impose." In fact, the court hardly engaged in any independent reasoning at all. Instead, the court simply cited other district court decisions deeming EWA advances to be extensions of consumer credit. But those decisions are neither binding nor persuasive. They disregard the relevant text, defer to inapposite and obsolete agency interpretations, and misconstrue Congress's objectives. The district court erred by following them. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction over plaintiffs' MLA and TILA claims under 28 U.S.C. § 1331, and it had supplemental

4

jurisdiction over plaintiffs' state-law claims under 28 U.S.C. § 1367. The district court denied MoneyLion's motion to compel arbitration in an order entered March 9, 2026, SPA1, and MoneyLion filed a timely notice of appeal on March 16, 2026, JA188. This Court has jurisdiction under 9 U.S.C. § 16(a)(1).

## STATEMENT OF ADDENDUM

Pursuant to Fed. R. App. P. 28(f), an addendum containing pertinent statutes and regulations is filed concurrently with this brief.

## ISSUES PRESENTED

1. Whether Instacash advances qualify as extensions of "credit," even though users have no obligation to repay the funds.

2. Whether optional express delivery fees and tips constitute "finance charges," even though users may obtain the same Instacash advance without paying such fees or tips.

3. Whether Section 987(f)(4) of the MLA can bar arbitration of claims arising under TILA and state law.

## STATEMENT OF THE CASE

### A.   Legal Background

1. The interpretive issues in this case turn on the intersection of the FAA and the MLA. Over a century ago, Congress enacted the FAA in

response to "widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The statute reflects a "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). And it effectuates that policy by requiring courts to "'rigorously enforce' arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (citation omitted); *see* 9 U.S.C. § 2.

Parties seeking to establish that Congress overrode the FAA "face[] a stout uphill climb." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). They must "bear[] the heavy burden of showing" a "clear and manifest congressional command to displace the Arbitration Act and outlaw [arbitration] agreements" of a particular character. *Id.* at 510-11.

2. The MLA regulates entities that "extend[] consumer credit" to active-duty servicemembers and their dependents. 10 U.S.C. § 987(a). The statute prescribes a maximum 36% annual percentage rate of interest and certain mandatory disclosures. *See id.* § 987(b), (c). And it also bars arbitration of certain types of disputes. Specifically, Section 987(f)(4) states that "[n]otwithstanding" the FAA, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be

enforceable against any covered member or dependent." *Id.* § 987(f)(4); *see* 32 C.F.R. § 232.9(d) (arbitration bar applicable to "any dispute involving the extension of consumer credit to a covered borrower pursuant to this part").

The MLA delegates authority to the Secretary of Defense to define "consumer credit." 10 U.S.C. § 987(h)(2)(D), (i)(6). The Secretary's regulation (the MLA Rule) defines "[c]onsumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes," and that is, among other things, "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1). The MLA Rule further defines "credit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." *Id.* § 232.3(h). Neither the MLA Rule nor TILA defines "debt." Meanwhile, the MLA Rule defines "finance charge" to have "the same meaning as 'finance charge' in Regulation Z." *Id.* § 232.3(n). In turn, Regulation Z provides that a "finance charge" "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a).

7

Regulation Z implements TILA—a 1968 statute designed to facilitate the "informed use of credit" by consumers. 15 U.S.C. § 1601(a); *see* Pub. L. No. 90-321, § 102, 82 Stat. 146 (1968). To accomplish that goal, TILA requires creditors to disclose certain information to enable consumers to "compare more readily" the credit options available. 15 U.S.C. § 1601(a); *see id.* § 1638.

## B. Factual Background

### 1. Earned Wage Access

MoneyLion offers an EWA service called Instacash.[1] EWA services are a recent, market-driven solution to help "address the lag between consumers' hours worked and receipt of their paychecks." 90 Fed. Reg. 60069, 60069-70 (Dec. 23, 2025). Using technology, EWA providers can measure users' already-earned wages and advance a portion of those wages to them at no or low cost. EWA thus enables users to cover "short-term liquidity needs," while they wait for their next paycheck. *Id.* at 60069.

---

[1] Because this appeal arises from the denial of a motion to compel arbitration, these facts are drawn from "relevant, admissible evidence" submitted by the parties below. *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833-34 (2d Cir. 2021) (citation omitted).

EWA services also carry significant advantages for consumers over traditional short-term liquidity options—like credit cards, overdraft fees, and payday loans. Most EWA providers, including MoneyLion, do not require users to repay advances and expressly disclaim any right to collect if a user chooses not to repay an advance. *See id.* at 60072. Bona fide EWA providers also do not run credit checks, engage in debt collection, or furnish information to consumer-reporting agencies. *Id.* Instead, if a consumer does not repay an advance, the provider typically declines to offer that consumer additional advances until repayment occurs. That framework distinguishes EWA from short-term extensions of credit—which carry risks of negative credit reporting, accruing interest charges, rolling over balances, debt collection, and lawsuits. And unlike creditors, EWA providers bear all the risk of loss if a consumer declines to repay—the consumer bears none.

As a result of these advantages, EWA services are now widely used in the United States. The CFPB has recognized that, as of 2022, more than ten million consumers used EWA-facilitated earned wage transfers, totaling $31.9 billion. *Id.* at 60070. The numbers have only grown since.

9

### 2. MoneyLion and Instacash Advances

MoneyLion is a financial-technology company focused on helping users manage their finances. To that end, MoneyLion offers a suite of services to users, one of which is an EWA service called Instacash. *See* JA132. Instacash is "designed to cover small expenses and prevent overdraft fees" in the interval between paychecks. JA164.

To become eligible for Instacash, a user must have a "recurring direct deposit" of "wages, compensation, or other income." JA134. Eligible users may then obtain cash advances disbursed into their designated bank account, "up to the amount of [their] Instacash Advance limit." JA133. Users pre-authorize "an electronic fund transfer" on a scheduled "repayment date." JA137. But they ultimately "choose [whether] to repay [an] Instacash Advance" because they may always "withdraw [their] pre-authorized automatic payment authorizations before the scheduled repayment date." JA137-138.

Instacash users have no obligation to repay any advance. MoneyLion's Terms provide: "**THERE IS NO OBLIGATION TO REPAY AN INSTACASH ADVANCE.**" JA132; *see* JA136 (same).

10

Thus, after receiving an advance, the user can choose to keep the funds and walk away without repaying.

If the user declines to repay, MoneyLion cannot seek to collect the unpaid advance, refer it to a debt collector, or report it to a credit agency. Specifically, MoneyLion "warrants that it has no legal or contractual claim against [a user] based on [their] failure to repay in full an Instacash Advance, including any Turbo Fees and Tips associated with any Instacash Advance." JA136. And MoneyLion promises that it "will not (a) engage in any debt collection activities relating to any unpaid portion of any Instacash Advance or any unpaid Turbo Fees or Tips, (b) place the unpaid portion of any Instacash Advance or any unpaid Turbo Fees or Tips as a debt with . . . a third party, or (c) report to a consumer reporting agency concerning an Instacash Advance." JA136. If a user declines to repay an advance, the only effect is that MoneyLion "will not provide [the user] with further Instacash Advances" until repayment is made. JA136.

Instacash is a free service. Any user who elects to receive a standard delivery advance can do so "at no additional cost." JA136. A standard delivery advance "will typically be available" between "one (1) and five (5) business days from the date of [the] request," due to

11

processing times for Automated Clearing House (ACH) transactions. JA136. That 1-5 day period is substantially faster than the ordinary two-week payroll cycle.

If a user prefers access to an advance sooner, they can also choose to expedite the advance, so it arrives "within minutes." JA136. To obtain that expedited access, the user pays an express delivery fee "when [they] repay the Instacash Advance," unless they exercise their right not to repay the advance and the fee. JA136. During the relevant time period for this case, the express delivery fee ranged between $0.49-$8.99, depending on the size of the advance. JA26.

MoneyLion also permits "Optional Tipping" by users. JA135 (emphasis omitted). The Terms explain that users "may choose to give MoneyLion an amount in appreciation of its service (a 'Tip')." JA135. And they further emphasize that "[t]ips are completely voluntary, and whether or not [users] choose to leave a Tip and how much [they] choose to give do not impact [their] eligibility for any future Instacash Advance(s) or [their] Instacash Advance limit." JA135.

Thus, Instacash works for both consumers and MoneyLion. Through technology, MoneyLion can detect users' recurring income,

12

allowing it to tailor advance amounts to each user and limit its risk of loss to one advance per user. In turn, users may receive no-cost, non-recourse advances of their earned wages. And because most customers want to continue using the service—because it does not have the risks of payday loans—they are incentivized to repay advances.

### 3. Agreements Between Plaintiffs and MoneyLion

All MoneyLion customers, including plaintiffs, enter an Agreement for Resolving Disputes (Arbitration Agreement) upon joining the MoneyLion platform. JA67. The Arbitration Agreement provides for arbitration of "any past, present, or future dispute or controversy between [the user] and MoneyLion, whether or not presently known, that relates in any way to [the user's] use of or access to the MoneyLion Platform or to any product or service offered by or through the MoneyLion Platform." JA73, JA86, JA99. The Arbitration Agreement permits users to "opt out of arbitration" by mailing a signed notice to MoneyLion within 30 days. JA76, JA89, JA102.

Plaintiffs used the MoneyLion platform and agreed to the Terms and Arbitration Agreement. JA67-69. Plaintiffs allege that they were active-duty servicemembers as of the filing of the Amended Complaint.

13

JA47. They further allege that they each obtained multiple advances and paid either tips or express delivery fees. JA48-49. No plaintiff opted out of the Arbitration Agreement. JA69.

## C. Procedural History

Plaintiffs sued MoneyLion on behalf of themselves and four putative classes. JA50. They allege that MoneyLion violated the MLA, TILA, the Georgia Payday Lending Act, and the Illinois Predatory Loan Prevention Act by failing to make certain disclosures and charging interest rates that exceed relevant statutory thresholds. JA56-59. MoneyLion moved to compel arbitration or, in the alternative, to dismiss plaintiffs' complaint. The district court (Ho, J.) denied the motion. *See Lowe v. MoneyLion Techs. Inc.*, 2026 WL 654719 (S.D.N.Y. Mar. 9, 2026). The court "conclude[d] that Plaintiffs have plausibly alleged that Instacash constitutes consumer credit: making it subject to various statutes and voiding any arbitration clauses in Plaintiffs' contract with MoneyLion." SPA4.

First, the district court concluded that Instacash "falls squarely within the definition of credit." SPA6 (quoting *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935 (N.D. Cal. 2025)). The court acknowledged that

14

"while a customer must agree to a preauthorized debit, it is possible for such debit to be cancelled before payday." SPA6. And it recognized that "MoneyLion waives all potential recourse for recovering outstanding advances." SPA6. Nonetheless, the court determined that the "no-recourse structuring" of Instacash does not "take[] the[] product out of the realm of consumer credit." SPA6.

Next, the district court agreed with plaintiffs that "MoneyLion's advances are 'subject to a finance charge' through the Turbo fees and tips charged when a user takes out" an advance. SPA7. The court cited plaintiffs' allegations that "Turbo Fees and Tips are part and parcel of the overwhelming majority of Instacash advances." SPA7. Thus, "[a]s alleged, the Court conclude[d] that at least the expedite fee plausibly represents a charge [MoneyLion] imposed on [Plaintiffs] (and other [MoneyLion] users) 'as an incident to or a condition of the extension of credit.'" SPA7-8 (alterations in original) (citation omitted).

Finally, "[i]n light of the Court's determination that Instacash is an extension of consumer credit, the Court conclude[d] that the arbitration clause is unenforceable" as to all of plaintiffs' claims. SPA10. And the court further found that "the MLA's explicit prohibition on submitting

15

consumer credit agreements to arbitration applies to this case." SPA10. Accordingly, the court denied MoneyLion's motion to compel arbitration. SPA10.[2]

## SUMMARY OF ARGUMENT

I. Plaintiffs' claims are arbitrable because they do not "involv[e] the extension of consumer credit." 10 U.S.C. § 987(f)(4).

A. Instacash advances are not an extension of "credit." 32 C.F.R. § 232.3(f)(1). "Credit" means "the right granted to a consumer by a creditor . . . to incur debt and defer its payment." *Id.* § 232.3(h). In turn, "debt" entails a legal or contractual obligation to pay a sum of money. That meaning is confirmed by dictionaries, federal law, state law, case law, and administrative guidance.

Under that meaning, Instacash users are not in "debt" to MoneyLion. MoneyLion's Terms expressly state: "**THERE IS NO OBLIGATION TO REPAY AN INSTACASH ADVANCE.**" JA132.

---

[2] The district court also denied MoneyLion's motion to dismiss plaintiffs' state-law claims. SPA8-10. The merits of that denial—which turn on similar inquiries as those here—are not at issue on appeal. But if this Court were to agree with any of MoneyLion's arguments on appeal, then those state-law claims would be subject to arbitration alongside the federal claims.

16

And MoneyLion "warrants that it has no legal or contractual claim against [a user] based on [their] failure to repay in full an Instacash Advance." JA136. Thus, a user can obtain an Instacash advance, choose not to repay, and walk away with the funds while facing no adverse financial consequences.

The district court nonetheless held that Instacash users incur "debt." That holding was flawed in multiple ways. As an initial matter, the court erroneously applied a motion-to-dismiss standard—not a motion-to-compel standard—when addressing the "credit" issue.

On the merits, the district court primarily relied on non-binding decisions by other district courts holding that EWA advances involve the extension of "credit." But many of those decisions fail to grapple with the term "debt"; and the ones that do address that term apply an amorphous "functional" understanding that lacks judicially manageable limits and is untethered to the statutory context. The decisions also improperly defer to inapposite regulatory interpretations and elevate the supposed statutory purpose over the text itself.

B. Even if Instacash advances involved "credit," they would not be extensions of "consumer credit" covered by the MLA Rule because they

17

are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). A "finance charge" is a charge "imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a).

Here, optional express delivery fees and tips are not finance charges because they are not "imposed" by MoneyLion "as an incident to" an extension of credit. Only mandatory fees are "imposed" by a creditor on a consumer; optional fees (like express delivery fees and tips) are not "imposed" by the creditor, but rather voluntarily chosen by the consumer. Nor are optional fees "incident to" an extension of credit because that phrase "implies some *necessary* connection between the antecedent and its object." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 240-41 (2004). There is no "necessary connection" between an express delivery fee or tip and an advance, because a user can obtain the same advance in the same amount without paying any express delivery fee or tip. Recognizing as much, the CFPB recently concluded that EWA providers' optional express delivery fees and tips do not qualify as "finance charges."

In holding that express delivery fees and tips are finance charges, the district court never addressed the ordinary meaning of "imposed." Instead, it again relied on non-binding district court decisions. But those

18

decisions rest on atextual reasoning and misconstrue precedent. The district court erred by following them.

II. At minimum, the district court erred by holding that Section 987(f)(4) of the MLA precludes arbitration of plaintiffs' TILA and state-law claims. Nothing in Section 987(f)(4) suggests that Congress sought to bar arbitration of claims arising outside of the MLA itself. And the MLA Rule confirms that Section 987(f)(4)'s arbitration bar applies only to "dispute[s] involving the extension of consumer credit to a covered borrower *pursuant to this part*." 32 C.F.R. § 232.9(d) (emphasis added).

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's denial of a motion to compel arbitration" and reviews for clear error "factual findings upon which [a district court's] legal determination is based." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023).

## ARGUMENT

Plaintiffs and MoneyLion agreed to arbitration, and the district court should have enforced the terms of their bargain. The court's only basis for refusing to do so was its conclusion that Section 987(f)(4)'s arbitration bar applies.

But that holding was erroneous in multiple respects. First, Instacash advances do not involve the extension of "credit" because users have no obligation to repay those advances. Second, even if the advances were credit, express delivery fees and tips are not "finance charges" because they are entirely optional. Third, at the very least, the court erred by holding that Section 987(f)(4) of the MLA bars arbitration of plaintiffs' *non-MLA* claims. This Court should reverse.

## I. PLAINTIFFS' CLAIMS ARE ARBITRABLE BECAUSE THEY DO NOT INVOLVE THE EXTENSION OF CONSUMER CREDIT

Contrary to the decision below, Section 987(f)(4) does not preclude arbitration of plaintiffs' claims. As noted above, Section 987(f)(4) states that "[n]otwithstanding" the FAA, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered" servicemember. 10 U.S.C. § 987(f)(4). That provision thus applies only to disputes "involving the extension of consumer credit." *Id.* The MLA Rule defines consumer credit as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes," and that is, among other things, "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1). Here, Instacash advances do not involve

the extension of consumer credit because they are neither "credit" nor subject to a "finance charge." The district court thus erred in holding that the MLA precludes arbitration of plaintiffs' claims.

### A. Instacash advances are not extensions of credit.

Instacash advances are not subject to the MLA because they do not extend "credit." An extension of credit necessarily requires that the consumer incur a "debt"—*i.e.*, a legal or contractual obligation to pay—a creditor. But Instacash advances carry no such obligation. To the contrary, MoneyLion expressly disclaims any such obligation in its Terms, and users are never subject to debt collection, interest charges, late fees, or adverse credit reporting if they opt not to repay an advance. Thus, users face no risk of adverse financial consequences if they choose not to repay—MoneyLion assumes all the risk of nonpayment.

The district court's ruling rests on decisions by other district courts ruling against EWA providers in this context. Those decisions are neither binding nor persuasive. They contravene the ordinary meaning of "debt" in the context of consumer contracts, rely on inapposite and superseded regulatory interpretations, and create an atextual and unworkable framework for courts, creditors, and consumers.

21

### 1. "Debt" requires a legal or contractual obligation to pay.

The MLA Rule defines "credit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). TILA and Regulation Z define it in substantially the same manner. *See* 15 U.S.C. § 1602(f); 12 C.F.R. § 1026.2(a)(14). Accordingly, an extension of "credit" occurs only if a consumer incurs a "debt." Because the term "debt" is not defined by the relevant statutes or regulations, courts must look to its "ordinary meaning." *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) (citation omitted). And when determining that ordinary meaning, courts must consider the "context of the[] word[]—the water in which [it] swim[s]." *United States v. Hansen*, 599 U.S. 762, 775 (2023).

Here, in the context of consumer contracts, the ordinary meaning of "debt" is clear: a legal or contractual obligation to pay a sum of money. If consumers owe a debt, they have no option but to pay it, or else face consequences—like calls from debt collectors, a lawsuit to recover the funds, and a ding to their credit scores. Conversely, a suggestion—or even an expectation—that they pay does not create a debt. Dictionaries,

22

federal law, state law, case law, and recent administrative guidance all point to the same conclusion.

Common dictionaries from the time of TILA's enactment (and Regulation Z's promulgation) define "debt" as "[t]he condition of being under obligation to pay money to, or perform services for, another." *Debt*, Webster's New Twentieth Century Dictionary 443 (1965); *see Debt*, Random House Dictionary of the English Language 342 (1969) ("something that one person is bound to pay to or to perform for another" or "the condition of being under such an obligation"). And an "obligation" means "something that one is bound to do," *Obligation*, Webster's Seventh New Collegiate Dictionary 582 (1967), or "an agreement enforceable by law," *Obligation*, Random House Dictionary of the English Language 916 (1969).

Legal dictionaries likewise define "debt" as "a legal liability to pay a specific sum of money" or an "obligation of [a] debtor to pay . . . a specified sum of money." *Debt*, Black's Law Dictionary (4th rev. ed. 1968); *see id.* ("The word 'debt' carries with it the requirement of certainty, the foundation of promise by express contract, and necessarily implies legality."). And when used as a "legal term," the word "obligation"

23

means "any certain written promise to pay money or do a specific thing," or "[a] formal and binding agreement or acknowledgement of a liability to pay a certain sum or do a certain thing." *Obligation*, Black's Law Dictionary (4th rev. ed. 1968). Thus, a person does not incur "debt" unless they assume a legally binding commitment to pay a sum of money.

Federal statutes and regulations reinforce that understanding of "debt." *See* 32 C.F.R. § 232.3(s) (words not defined in MLA Rule or Regulation Z "have the meanings given to them by State or Federal law"). The Fair Debt Collection Practices Act (FDCPA) defines "debt" as "any *obligation* or alleged *obligation* of a consumer to pay money arising" from certain personal or household transactions. 15 U.S.C. § 1692a(5) (emphases added). And the Bankruptcy Code defines "debt" as "liability on a claim," 11 U.S.C. § 101(12), and then defines "claim" to mean a "right to payment," *id.* § 101(5)(A). These statutory definitions make clear that a legal or contractual obligation to pay is an essential feature of "debt."

TILA and the MLA also invoke that meaning of "debt." TILA and Regulation Z require lenders to provide disclosures "before consummation of the transaction," 12 C.F.R. § 1026.17(b), with "consummation" defined as "the time that a consumer becomes

24

contractually *obligated* on a credit transaction," *id.* § 1026.2(a)(13) (emphasis added). Likewise, the MLA's protections apply to "covered [b]orrowers," which "means a consumer who . . . becomes *obligated* on a consumer credit transaction." 32 C.F.R. § 232.3(g)(1) (emphasis added).

Case law embraces this ordinary meaning of "debt" as well. This Court recently described "[t]he classic debt" as "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest." *Powell v. Ocwen Fin. Corp.*, 173 F.4th 386, 394 (2d Cir. 2026) (quoting *Gilbert v. Commissioner*, 248 F.2d 399, 402 (2d Cir. 1957)). And it found that the notes at issue "reflect[ed] a traditional debt structure" because they "entitle[d] the noteholders to receive fixed payments of interest and principal at regular intervals." *Id.* at 395. Similarly, this Court has explained that "to qualify for the debt exception" under the Exchange Act, "the debt at issue must constitute 'an obligation to pay a fixed sum certainly and at all events.'" *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43-44 (2d Cir. 2012) (quoting *Rheem Mfg. Co. v. Rheem*, 295 F.2d 473, 476 (9th Cir. 1961)); *see also In re AgriProcessors, Inc.*, 859 F.3d 599, 605 (8th Cir. 2017) ("The

25

test for when a debt is incurred is whether the debtor is legally obligated to pay." (citation omitted)).

In addition, "[t]he Supreme Court has held that the plain meaning of a 'debt' . . . 'is nothing more or less than an enforceable obligation.'" *In re Davis*, 194 F.3d 570, 577 (5th Cir. 1999) (quoting *Pa. Pub. Welfare Dep't v. Davenport*, 495 U.S. 552, 559 (1990)). It thus emphasized nearly 150 years ago that "[a]ny one who is under no legal obligation or liability to pay [a] debt is a stranger [to the debt]." *Aetna Life Ins. Co. v. Town of Middleport*, 124 U.S. 534, 551 (1888) (citation omitted). And even before that, it recognized that certain bonds were "debts" because a city was "under a statutory and legal obligation to provide for" them. *United States v. Fort Scott*, 99 U.S. 152, 158 (1879).

State courts have interpreted "debt" in the same manner. Plaintiffs are residents of Alabama, Illinois, and Georgia. *See* JA12-13; JA139 (choice of law turns on user's state of residence). Courts in those States agree that "[f]or an indebtedness to exist, there must be an obligation to pay." *St. Paul Fire & Marine Ins. Co. v. Nowlin*, 542 So. 2d 1190, 1194 (Ala. 1988); *see, e.g., Stollenwerck v. Marks & Gayle*, 65 So. 1024, 1027 (Ala. 1914) ("Debt . . . means a duty or obligation to pay, for the

26

enforcement of which an action will lie." (citation omitted)); *Dewey v. Denson*, 120 S.E. 805, 807 (Ga. 1923) ("A debt . . . denotes, not only the obligation of one person to pay, but the right of the other party to receive and enforce payment by judicial action."); *In re Marriage of Baumgartner*, 890 N.E.2d 1256, 1274-75 (Ill. Ct. App. 2008) ("'Debt' is defined as '[l]iability on a claim; a specific sum of money due by agreement or otherwise.'" (citation omitted)); *see also Debt*, Black's Law Dictionary (4th rev. ed. 1968) (citing various similar state-law definitions of "debt").

Finally, recent administrative guidance endorses this understanding of "debt." In December 2025, the CFPB—the agency tasked with implementing TILA and Regulation Z, *see* 15 U.S.C. § 1604(a)—issued an Advisory Opinion determining that TILA ordinarily does not apply to EWA services. 90 Fed. Reg. 60069 (Dec. 23, 2025). In so doing, the CFPB observed that "the common meaning of debt is 'a sum of money due by certain and express agreement' or 'a financial liability or obligation owed by one person, the debtor, to another, the creditor.'" *Id.* at 60071 (quoting *Debt*, Black's Law Dictionary (4th ed. 1968)). And

27

it indicated that where a user "incurs no such liability or obligation," no "debt" arises for purposes of TILA and Regulation Z. *Id.*[3]

### 2. Instacash users incur no debt because they have no obligation to repay advances.

Applying the ordinary meaning of "debt" here, Instacash is not an extension of credit because users have no legal or contractual obligation to repay any advance. MoneyLion's Terms could not make this point any clearer. The Terms begin with the following capitalized, bold disclaimer: "**INSTACASH IS NOT A LOAN. MONEYLION IS NOT LENDING YOU MONEY IN CONNECTION WITH THE INSTACASH**

---

[3] Instacash does not qualify as "Covered EWA" under the Advisory Opinion because MoneyLion makes advances directly to users, rather than through "a payroll process deduction in connection with the worker's next payroll event." 90 Fed. Reg. at 60071. Nonetheless, the Advisory Opinion emphasizes that the "primary reason" that EWA services do not involve the extension of credit is that they do not fall within "the common meaning of debt"—*i.e.*, "a financial liability or obligation" to repay. *Id.* And it further states that EWA services "lack typical substantive indicia of credit" because providers "reserve no recourse" and "cannot engage in debt collection." *Id.* at 60072. That reasoning applies equally to direct-to-consumer EWA services like Instacash. *See id.* at 60071 ("This advisory opinion does not state, and nothing in it should be understood to state, that EWA products that are not Covered EWA are credit under Regulation Z . . . . The CFPB continues to seek stakeholder feedback and evaluate whether it should take further legal steps with respect to EWA products, including steps that might encompass non-Covered EWA." (emphases omitted)).

28

**SERVICE. THERE IS NO OBLIGATION TO REPAY AN INSTACASH ADVANCE.**" JA132. The Terms later repeat the same message: "**THERE IS NO OBLIGATION TO REPAY AN INSTACASH ADVANCE**." JA136.

MoneyLion also affirms that users face no financial consequences or penalties if they choose not to repay. MoneyLion "warrants that it has no legal or contractual claim against [a user] based on [their] failure to repay in full an Instacash Advance, including any Turbo Fees and Tips associated with any Instacash Advance." JA136. That is, the user has a contractual right to choose *not* to repay—and exercising that right does not breach the contract. Moreover, MoneyLion promises not to "engage in any debt collection activities," not to refer the "unpaid portion" of an advance to any "third party," and not to report the user to "a consumer reporting agency." JA136. The only effect of nonpayment is that "MoneyLion will not provide [the user] with further Instacash Advances" unless the user repays the outstanding one. JA136.

Although MoneyLion's Terms establish procedures to govern repayment, those procedures do not create an obligation to repay. To use MoneyLion's services, users must link their bank account and associated

29

debit card. *See* JA134, JA137. If a user "choose[s] to repay [their] Instacash Advance, [they] may repay by authorizing" MoneyLion to charge their card or account. JA137. That "can be done by pre-authorizing automatic payments to be made . . . or by making a one-time repayment." JA137.

But critically, a user's payment authorization is freely revocable without consequence: Instacash users "may withdraw [their] pre-authorized automatic payment authorizations before the scheduled repayment date." JA138. MoneyLion instructs users how to do so in its FAQs, which are easily accessible on its website: "If you no longer wish to repay your advances, you can revoke your payment authorization by: Removing your payment method in the MoneyLion app" or by contacting MoneyLion via email, phone, or mail. JA186 (emphases omitted). And as already explained, if a user revokes that authorization and refrains from repayment, MoneyLion "has no legal or contractual claim against [them]." JA136.[4]

---

[4] Instacash users may also freely defer repayment without any financial consequence. JA184 (explaining deferral process).

Ultimately, MoneyLion's business model works because users want to continue using Instacash and are thus incentivized to repay advances. But they are not legally or contractually bound to repay—and no financial consequences will flow from a decision to walk away. That feature of MoneyLion's EWA service makes it fundamentally distinct from payday loans, which can lead to cycles of debt and compounding interest. And that feature of the service is also dispositive of the "debt" inquiry. Because Instacash users face no "legal liability" if they decline to repay, they incur no "debt." *Debt*, Black's Law Dictionary (4th rev. ed. 1968).

### 3. The district court's contrary conclusion lacks merit.

Despite the plain meaning of "debt" and MoneyLion's unambiguous Terms, the district court rejected MoneyLion's credit argument in only two paragraphs. SPA6-7. That short discussion applies the wrong legal standard and contains no independent analysis of the statutory or regulatory text. Instead, it simply "agrees with every other [district] court to have reached the issue, and concludes that" Instacash "falls squarely within the definition of credit." SPA6 (quoting *Orubo v.*

31

*Activehours, Inc.*, 780 F. Supp. 3d 927, 935 (N.D. Cal. 2025)). But the nonbinding decisions on which the court relied lack persuasive force.

a. As an initial matter, the district court applied the wrong legal standard. "Courts deciding motions to compel arbitration 'apply a standard similar to that applicable for a motion for summary judgment,'" in which they "'consider[] all relevant, admissible evidence submitted by the parties.'" *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833-34 (2d Cir. 2021) (citations omitted). The court below failed to apply that standard; instead, it incorrectly applied the standard governing MoneyLion's alternative motion to dismiss to MoneyLion's principal motion to compel arbitration.

The district court first stated that it drew the facts "from the First Amended Complaint," which "are assumed to be true for purposes of adjudicating the Motion to Dismiss or Compel Arbitration." SPA1. But courts are only "required to accept all 'well-pleaded factual allegations' in the complaint as true" when "deciding a Rule 12(b)(6) motion to dismiss a complaint." *Lynch v. City of N.Y.*, 952 F.3d 67, 74-75 (2d Cir. 2020) (citation omitted). As already explained, a summary-judgment standard—not a motion-to-dismiss standard—applies to a motion to

32

compel arbitration. *See* D. Ct. Dkt. 31 at 10 (MoneyLion making this argument in the district court).

The district court proceeded to evaluate the "credit" issue by asking whether plaintiffs "plausibly alleged that Instacash constitutes consumer credit." SPA4; *see* SPA8 (same). And it "conclude[d] that the arbitration clause is unenforceable" because "the Plaintiffs have adequately alleged that the MLA applies here." SPA10. But again, that "plausible" allegation standard governs motions to dismiss—not motions to compel arbitration. *Lynch*, 952 F.3d at 74 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The district court's application of the wrong standard infected its legal analysis. MoneyLion submitted important evidence bearing on arbitrability—specifically, the Terms and FAQs, which made clear that users have no obligation to repay an Instacash advance. *See, e.g.*, JA136, JA181, JA186. And notably, plaintiffs did not submit any evidence of their own to contradict MoneyLion's submissions. Under the proper summary-judgment standard, the court should have considered "all relevant, admissible evidence." *Soliman*, 999 F.3d at 833 (citation omitted).

Because the court applied a motion-to-dismiss standard, it relied only on what "Plaintiffs have plausibly alleged," SPA4, rather than on what MoneyLion's uncontested evidence showed. For example, the court cited only the complaint when briefly noting the "possib[ility]" that a customer's debit authorization could "be cancelled before payday." SPA6. In contrast, the FAQs elaborate on that cancellation process in detail and affirmatively instruct users how to revoke their debit authorization if they "no longer wish to repay." JA186. That evidence directly rebuts plaintiffs' allegation that the revocation process is "poorly explained" and "not highlighted." JA42. Yet the court apparently never even considered it. At the very least, then, this Court should vacate and remand for the district court to consider MoneyLion's evidence.

b. In addition to applying the wrong legal standard, the district court erred on the merits by holding that Instacash "falls squarely within the definition of credit." SPA6 (citation omitted). In reaching that conclusion, the court conducted little analysis of its own. It never analyzed the ordinary meaning of "debt," on which the definition of "credit" depends. Instead, it simply followed recent district court decisions that have deemed similar EWA services to be extensions of

34

"credit" under the MLA and TILA. *See* SPA6-7 (citing *Orubo*, 780 F. Supp. 3d 927; *Burrison v. FloatMe Corp.*, 2026 WL 444638, at *6-7 (D. Mass. Feb. 17, 2026); *Johnson v. Activehours, Inc.*, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025); *Vickery v. Empower Fin., Inc.*, 2025 WL 2841686, at *4-5 (N.D. Cal. Oct. 7, 2025); *Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1158-59 (W.D. Wash. Sept. 8, 2025)). Those decisions are, of course, not binding on this Court.[5] And they carry no persuasive value because they all rest on the same set of flaws: they distort the relevant statutory and regulatory language; defer to inapposite agency commentary; and elevate the supposed statutory purpose over the text.

*Text.* The textual positions advanced in the cited lower court decisions are misconceived. Most of the decisions do not analyze the meaning of the term "debt" at all. *See Orubo*, 780 F. Supp. 3d at 935; *Johnson*, 2025 WL 2299425, at *8; *Burrison*, 2026 WL 444638, at *6-7. The ones that do address the term "debt" recognize that it requires an obligation to pay but posit that the relevant obligation need not be legal or contractual in nature. *See Vickery*, 2025 WL 2841686, at *5; *Moss*, 799

---

[5] Some of those decisions are now on appeal. *See Burrison v. FloatMe, Corp.*, No. 26-1256 (1st Cir.); *Vickery v. Empower Fin., Inc.*, No. 25-6377 (9th Cir.); *Moss v. Cleo AI Inc.*, No. 25-5856 (9th Cir.).

F. Supp. 3d at 1159.  Instead, they assert that a consumer incurs a debt so long as they have a "functional" obligation to repay.  *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1050 (N.D. Cal. 2025).  That argument disregards the ordinary meaning of "debt," as explained above. *See supra* at 23-26.  But even if "debt" could suggest a mere "functional obligation" in some circumstances, context forecloses that reading here.

The MLA and its implementing regulations "cannot be construed in a vacuum"; they must be read in "context and with a view to their place in the overall statutory scheme."  *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted).  Here, the relevant context is consumer lending, a domain defined by contracts between consumers and creditors. Regulation Z thus specifies that consumer credit transactions are consummated when "a consumer becomes contractually obligated." 12 C.F.R. § 1026.2(a)(13).  In this contract-based context, the term "debt" most naturally refers to a *contractual* or *legal* obligation to pay.  *See Hagar v. Reclamation Dist. No. 108*, 111 U.S. 701, 706 (1884) (noting that "debts" refers to "obligations for the payment of money founded on contracts"); *Clinton Mining & Min. Co. v. Beacom*, 266 F. 621, 623 (3d Cir. 1920) ("the word 'debt' carr[ies] with it the . . . the foundation of

36

promise by express contract"). And Instacash users have no contractual or legal obligation to repay because MoneyLion has expressly disclaimed any "legal or contractual claim against [any user] based on [a] failure to repay" an advance. JA136. Under that provision, declining to repay is fully consistent with—not a breach of—the parties' contract.

This meaning of "debt" also makes sense in light of the MLA's "overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted). The Department of Defense has explained that the "overarching aim" of the MLA is "to promote readiness by taking steps to reduce the risk that a Service member or his or her family could get caught in a 'debt trap.'" 80 Fed. Reg. 43560, 43566 (July 22, 2015). Such a "debt trap" can manifest only if a servicemember faces legal consequences for nonpayment—such as mounting penalties, debt collection, and adverse credit reporting. A consumer who has no legal or contractual obligation to repay—and who can thus walk away with an advance and face no repercussions—cannot be "trapped" in any sense Congress sought to prevent.

To be sure, some less-common dictionary definitions of "debt" may encompass "moral" or functional obligations. *See, e.g.*, *Debt*, Webster's

37

New Twentieth Century Dictionary 443 (1965) (a "[n]eglected moral duty"). But a "word in a statute" often does "not extend to the outer limits of its definitional possibilities." *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006). And here, a moral or functional meaning of "debt" makes no sense in this contract-based context—just as it would make no sense in the context of bankruptcy or tax statutes that also use the term "debt." *See, e.g.*, 11 U.S.C. § 727(b); 26 U.S.C. § 61(a)(11). Indeed, nothing suggests that when Congress or the Department of Defense referred to "debt" in statutes and regulations governing consumer contracts, they meant to include obligations that were not created by contracts. Unsurprisingly, no court applying a "functional" obligation theory has identified the source of such a non-contractual obligation. *See, e.g.*, *Revell*, 808 F. Supp. 3d at 1050; *Orubo*, 780 F. Supp. 3d at 935.

A "functional" obligation theory is also unworkable. How is a court or creditor supposed to discern when to disregard the written terms and find that a consumer is functionally obligated to pay a sum of money? No court has answered that question. Such a malleable standard would only embolden debt collectors to reframe any payment authorization—such as an autopay enrollment or free trial period—as "debt," thereby promoting

38

aggressive collection tactics. And any company providing a non-credit service that could "functionally" induce consumers to pay would have incentives to provide disclosures using inapposite credit terms (*e.g.*, interest charges and annual percentage rates)—thus confusingly suggesting to consumers that they have a legally enforceable obligation to pay.

The district court below deviated from the text and erroneously expanded "debt" by emphasizing that Instacash users "agree[] to preauthorize a debit from their bank account." SPA6. But debit authorization provides the *procedure* for payment of an advance—not a binding obligation to do so. *See* JA137. As noted earlier, Instacash users may freely revoke their debit authorization and thus avoid paying back their advance or an expedited delivery fee. *See supra* at 30. Neither the district court here, nor in any other case, has explained how a freely revocable authorization for repayment can generate the legal obligation to pay that is the defining feature of "debt."

Indeed, under the district court's reasoning, a consumer would incur "debt" anytime they authorized automatic payments for a service. Such autopay mechanisms are ubiquitous—enabling convenient

39

payments for everything from gym memberships to video subscription services. Yet consumers do not become "indebted" to a business simply because they sign up for autopay; nor do those businesses suddenly become creditors. That is because consumers can disable the autopay and cancel their subscription before the next payment is debited. That commonsense logic forecloses the district court's assertion that "MoneyLion takes on essentially no risk for the amount of the cash advance" simply because customers "preauthorize a debit from their bank account." SPA6.

Some courts have also suggested that an obligation to repay arises from EWA providers' policy of denying future advances to users who do not repay. *See, e.g.*, *Revell*, 808 F. Supp. 3d at 1050; *see* SPA6 (referring to the "punishment" of "banning [a] customer from using Instacash in the future"). But that is simply a routine condition for future use of the service—not a remedy for nonpayment of the current advance. Such a condition does not create a "debt" because it does not leverage some external penalty to effectively coerce repayment. Rather, if a MoneyLion user declines to repay, they are no worse off than before they received the

40

advance—if anything, they are better off because they have received money that they do not need to repay.

Still other courts have relied on the premise that "non-recourse" transactions can sometimes qualify as "debt." *See, e.g.*, *Feeman v. Bridge It, Inc.*, 2026 WL 880508, at \*8 (S.D.N.Y. Mar. 30, 2026), *appeal filed*, No. 26-959 (2d Cir. Apr. 14, 2026). But cases addressing "non-recourse" debt support MoneyLion's position: They involve secured transactions, which create a repayment obligation that the lender can enforce by seizing the collateral provided as security. *See In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 586 (Bankr. S.D.N.Y. 2018) (explaining that a "non-recourse" secured transaction involves "an obligation that can be satisfied only out of the collateral securing the obligation and not out of the debtor's other assets") (quoting Black's Law Dictionary (10th ed. 2014)). Thus, "non-recourse" simply means no recourse against the *individual*—but the creditor still has recourse against the property. *See, e.g.*, *Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co*, 43 N.E.3d 911, 918 (Ill. 2015) (discussing a "nonrecourse consumer credit transaction, secured by the consumer's principal dwelling" where "the only recourse

41

is against the property itself"). Here, by contrast, MoneyLion has no recourse against either the user or their property.

Finally, some courts have pointed to the high repayment rates of EWA advances as evidence that users have an obligation to repay. *See, e.g., Orubo*, 780 F. Supp. 3d at 931, 936 & n.4. But even under a motion-to-dismiss standard, there would be an "obvious alternative explanation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007), for that high repayment rate: Customers want to keep using EWA services and know that repayment is necessary to obtain another advance. If 95% of Netflix subscribers choose not to revoke their automatic payments each month, no one would assume that the autopay mechanism is irrevocable. Instead, the natural inference is that the subscribers want to continue using the service. So too here.

***Regulatory interpretations.*** Courts have also incorrectly relied on inapposite and outdated agency staff commentary to Regulation Z that addresses "payday loans" and "deferred presentment" transactions. *See, e.g., Vickery*, 2025 WL 2841686, at *5 (citing 12 C.F.R. pt. 1026, Supp. I,

42

Para. 2(a)(14) Credit ¶ 2); *Orubo*, 780 F. Supp. 3d at 935.[6]   That commentary should play no role in the analysis for multiple reasons.

*First*, the commentary is obsolete.  As discussed above, in December 2025, the CFPB issued an Advisory Opinion determining that payroll-based EWA services with no obligation to repay are not consumer credit—a rationale that applies equally to direct-to-consumer EWA services with no obligation to repay. *See supra* at 27-28 & n.3.  Outdated staff commentary about different products—payday loans and deferred presentment transactions—cannot override current agency guidance on the precise service at issue.

*Second*, the staff commentary is inapposite even on its own terms. "Payday loans" and "deferred presentment" transactions create *irrevocable* repayment obligations.  12 C.F.R. pt. 1026, Supp. I, Para. 2(a)(14) Credit ¶ 2.  A loan must be repaid by the borrower to the lender; otherwise, the lender has a legal right to collect the borrowed sum, often with interest.  *See Loan*, Black's Law Dictionary (4th rev. ed. 1968) ("[a] contract whereby one delivers money to another who agrees to return [an]

---

[6]  *Orubo* appeared to erroneously believe that the commentary was part of Regulation Z itself.  *See* 780 F. Supp. 3d at 935.

43

equivalent sum," and the recipient bears a legal "liability for return" of that sum, often with "accrued interest"). And deferred presentment transactions likewise involve recourse if the borrower refuses to repay. *See, e.g.*, *Turner v. E-Z Check Cashing of Cookeville, TN, Inc.*, 35 F. Supp. 2d 1042, 1046 (M.D. Tenn. 1999) (explaining that in deferred presentment transactions, customers signed agreements "providing that the customer would repay" or the lender would deposit their checks, and the lender "threaten[ed] . . . criminal prosecution" for failure to repay). Those products thus possess the defining feature of "debt"—a legal obligation to repay—that Instacash advances lack.[7]

*Third*, and in all events, regulatory interpretations could be relevant only if the regulatory text were "genuinely ambiguous." *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). It is not. The "standard tools of interpretation," *id.*, make clear that a "debt" arises only if there is a legal

---

[7] Another part of the same staff commentary confirms that funds provided to consumers are not "credit" if the funding party—not the consumer—bears the risk of loss. *See* 12 C.F.R. pt. 1026, Supp. I, Para. 2(a)(14) Credit ¶ 1(viii) (express exclusion for "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced").

or contractual obligation to pay, and Instacash users incur no such obligation.

*Statutory purpose.* Lacking textual support, several courts have asserted that classifying EWA advances as "credit" is more consistent with statutory purpose. *See, e.g.*, *Orubo*, 780 F. Supp. 3d at 936. That reasoning fares no better. While Congress sought to protect servicemembers in the MLA, "[n]o statute pursues a single policy at all costs," and courts are "not free to rewrite th[e] statute . . . as if it did." *Advocate Christ Med. Ctr. v. Kennedy*, 605 U.S. 1, 19 (2025) (first alteration in original) (citation omitted). The "best evidence of [statutory] purpose," moreover, "is the statutory text" itself. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991). Here, the relevant statutory and regulatory text is limited to "debt," which unambiguously requires a legal or contractual obligation to pay.

In any event, applying the MLA and TILA to EWA services would not promote the objectives of those statutes. Both statutes are designed to facilitate the "informed use of credit" and "compar[isons]" across credit products, 15 U.S.C. § 1601(a), by requiring disclosure of terms like interest and late fees, *see id.* §§ 1601(a), 1638(a)(4), (10); 10 U.S.C.

45

§ 987(c). But EWA services like MoneyLion's carry no interest and have no repayment terms. Thus, requiring EWA providers to make TILA and MLA disclosures would only confuse consumers about the nature of the service.

Notably, a ruling for MoneyLion here would not leave EWA "unregulated," as the district court suggested. SPA4. Over the last several years, 32 States have either enacted or proposed laws specifically addressing EWA.[8] Many of these laws make clear that EWA services are not "[a] loan or other form of credit," and instead should be governed by regulations tailored to EWA. Nev. Rev. Stat. § 604D.190; *see, e.g.*, Ark. Code § 23-52-203; Ind. Code § 28-8-6-1002(a)(3); Kan. Stat. § 9-2407(a)(1)(A); La. Stat. § 9:3591.5; Mo. Stat. § 361.749; S.C. Code § 39-5-860; Utah Code § 13-78-106(1)(b). In addition, members of Congress have proposed a draft bill that would establish a new federal regime governing bona fide EWA services with no obligation to repay. *See* The Earned Wage Access Consumer Protection Act, H.R. ---, 119th Cong. (2026). Courts should permit that legislative process to run its course,

---

[8] *See* App'x to Brief of Amici Curiae American Fintech Council and Financial Technology Association, *Moss v. Cleo AI, Inc.*, No. 25-5856, Dkt. 24.2 (9th Cir. Feb. 6, 2026) (collecting statutes).

46

rather than shoehorn EWA into inapposite statutory schemes designed for fundamentally different products.

### B. Instacash advances are not subject to a finance charge.

The MLA's arbitration bar does not apply here for an additional, independent reason: Instacash advances are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i).

Under the MLA Rule, "[c]onsumer credit means credit offered or extended" that is "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). And the Rule defines finance charge to "ha[ve] the same meaning as 'finance charge' in Regulation Z." *Id.* § 232.3(n). In turn, Regulation Z provides that a "finance charge" "includes any charge . . . *imposed* directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a) (emphasis added). That definition does not cover the optional fees that users may choose to pay for faster delivery of advances, or the tips that users may choose to pay to show appreciation for the Instacash service. The district court erred in holding otherwise.

47

### 1. Optional express delivery fees and tips are not finance charges.

Express delivery fees and tips do not fall within Regulation Z's definition of "finance charge" because they are entirely optional. They are therefore not "imposed" by MoneyLion "as an incident to or a condition of the extension of credit."

a. A charge must be mandatory to be "imposed" by a creditor on a consumer. The meaning of "imposed" is clear: "to establish or apply as compulsory," or "to put upon." *Impose*, Webster's Seventh New Collegiate Dictionary 420 (1967); *see Impose*, Random House Dictionary of the English Language 668 (1969) ("to put or set by or as by authority"). Legal dictionaries mirror that definition. *See Impose*, Black's Law Dictionary (4th rev. ed. 1968) ("[t]o levy or exact as by authority"). A charge is thus "imposed" by a creditor on a consumer only if the creditor requires the consumer to pay it to obtain the credit—*i.e.*, in a manner that is "compulsory" or "by authority."

This Court and others have specifically recognized this ordinary meaning of the term "impose." In *United States v. Martin*, 974 F.3d 124 (2d Cir. 2020), the Court observed that "[t]he act of imposing something means 'to levy or exact,' or to 'establish or apply by authority,' or 'bring

48

about as if by force.'" *Id.* at 138 (quoting various dictionaries); *see United States v. Brow*, 62 F.4th 114, 120 (3d Cir. 2023) (similar). Thus, "[t]he act of imposing connotes the affirmative placement of a burden or a restriction." *Martin*, 974 F.3d at 138; *see CM, Inc. v. Canadian Indem. Co.*, 635 F.2d 703, 708 (8th Cir. 1980) (explaining that "impose" means "apply as compulsory" (citation omitted)). And correspondingly, an undertaking is not "imposed" if it is assumed "by assent" or "voluntarily." *Busch Props., Inc. v. Nat'l Union Fire Ins. Co.*, 815 F.3d 1123, 1127-28 (8th Cir. 2016). In the financial services context, then, "the term 'impose'" refers to "a requirement under a credit agreement that obligates the consumer to pay the relevant fee." *CFPB v. MoneyLion Techs. Inc.*, 799 F. Supp. 3d 152, 185 (S.D.N.Y. 2025); *see Lazo v. Sodexo, Inc.*, 931 F.3d 29, 32-33 (1st Cir. 2019) (concluding that an administrative "fee" is not "imposed" where a patron "does not *have to pay* [the] charge" (emphasis added)).

An example illustrates this ordinary meaning of "impose." Suppose a mortgage lender requires home buyers to pay numerous fees, including an origination fee, a credit reporting fee, an appraisal fee, and a recording fee. And suppose the lender also gives home buyers the option to pay an

extra sum to rush the underwriting process. No ordinary speaker would say that the lender has "imposed" this rush fee on the home buyer. That is because the fee is optional—the home buyer can still obtain the same product, the mortgage, without paying it.

Relying on this common meaning of "imposed," the CFPB's recent Advisory Opinion concludes that EWA providers' optional express delivery fees and tips are not finance charges. *See* 90 Fed. Reg. at 60074-76. The agency explained that, so long as express delivery fees are "triggered by the consumer's opting for expedited delivery[,] they are not 'directly or indirectly imposed' by the provider," and so cannot qualify as a "finance charge" under Regulation Z. *Id.* at 60075. Likewise, the agency explained that "a tip is defined as a gratuity," and "it is inherent in the meaning of 'tip' that it is not imposed, even if providing one is considered customary." *Id.* at 60076.

Here, MoneyLion's Terms make clear that express delivery and tips are entirely optional. The Terms state that "receiving an Instacash Advance is processed at no additional cost to [the user]" if the user selects standard delivery, which takes 1-5 days. JA136. They further explain that "[f]or an additional fee," the user "ha[s] the *option* to request

expedited disbursements to [their] Eligible Account," which will typically be "sent within minutes." JA136 (emphasis added). And they provide that "[a]ny Turbo Fee [the user] incur[s] will be paid if and when [they] repay the Instacash Advance." JA136. In turn, the FAQs repeat the same point: an express delivery "fee rolls into [the user's] repayment total, so there's nothing to pay upfront when [they] request [their] cash." JA168.

A user therefore has full control over whether to choose standard delivery—which is still much faster than the ordinary two-week payroll cycle—or express delivery. And if the user chooses express delivery, the associated fee is not debited immediately. Instead, it is debited simultaneously with subsequent repayment of an advance—meaning that if the user revokes debit authorization, they will not repay *either* the advance or the express delivery fee. Such an optional fee is not "imposed" on a user because it is not "a burden" "affirmative[ly] place[d]" on them, but instead is an option voluntarily chosen by them. *Martin*, 974 F.3d at 138.

The same logic applies to tips. The Terms state that "[a]t the time that [a user] initiate[s] an Instacash Advance, [they] may choose to give

51

MoneyLion an amount in appreciation of its service (a 'Tip')." JA135. The Terms emphasize that "[t]ips are completely voluntary, and whether or not [a user] choose[s] to leave a Tip and how much [they] choose to give do[es] not impact [their] eligibility for any future Instacash Advance(s) or [their] Instacash Advance limit." JA135. And the FAQs confirm that "whether or not [a user] tip[s] won't affect [their] limit or eligibility. It's totally optional—No pressure, no judgment." JA151 (emphasis omitted). Thus, tipping for the Instacash service is no different than the "familiar" practice of tipping across "the retail services economy"—and because "a bona fide tip provided by the consumer for EWA services" is "given voluntarily," it "cannot be a finance charge." 90 Fed. Reg. at 60076.

b. The phrase "incident to the extension of credit" solidifies the point. 15 U.S.C. § 1605(a). In *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232 (2004), the Supreme Court held that the Federal Reserve Board had reasonably determined that "fees imposed for exceeding a credit limit (over-limit fees)" were not finance charges because they were not clearly imposed "incident to" an extension of credit. *Id.* at 235, 241. In so holding, the Court explained that "incident to" "implies some *necessary* connection between the antecedent and its object." *Id.* at 241.

52

"[N]ecessary" often means "essential" or "requisite." *Necessary*, Random House Dictionary of the English Language 955 (1969); *see Necessary*, Black's Law Dictionary (4th rev. ed. 1968) ("indispensable or an absolute physical necessity"). Because over-limit fees were not essential to obtaining an extension of credit, they were not "unambiguously included" in the definition of "finance charge." *Pfennig*, 541 U.S. at 242.

Regulation Z supports *Pfennig*'s interpretation of "incident to" in TILA. As noted, Section 1605(a) of TILA defines "finance charge" to mean charges "imposed . . . by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). In turn, Regulation Z defines "finance charge" to mean charges "imposed . . . by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). By adding the phrase "or a condition of," Regulation Z cannot have "rewrit[ten]" or amended the "clear statutory" language of "incident to." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Instead, a regulation "must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute [it] implement[s]." *Koch Indus., Inc. v. United States*, 603 F.3d 816, 821 (10th Cir. 2010) (citation omitted). Thus, the phrase "or a condition of" reinforces that "incident to" means the

53

extension of credit must be conditioned on payment of the fee. Indeed, where the word "or" connects two phrases—here, "incident to *or* a condition of"—that formulation often creates "a single category" rather than "two separate categories." *United States v. Olano*, 507 U.S. 725, 732 (1993); *see, e.g.*, *McNally v. United States*, 483 U.S. 350, 359 (1987) ("second phrase" following the word "or" "simply made" the meaning of the first phrase "unmistakable").

Here, there is no "necessary connection," *Pfennig*, 541 U.S. at 241, between express delivery fees or tips and Instacash advances. A user can obtain the same advance in the same amount if they select the free standard delivery option and do not tip. And even if the user chooses express delivery, they can still receive the advance on an expedited timeframe without paying any fee by revoking the debit authorization and cancelling the entire repayment (including both the advance and the express delivery fee). *See* JA136, JA138. Express delivery fees and tips are therefore not necessary to obtaining an advance, and so they are not "imposed" on a user "incident to" an extension of credit.

c. Judicial decisions and longstanding administrative interpretations also support this conclusion. In *Veale v. Citibank,*

54

*F.S.B.*, 85 F.3d 577 (11th Cir. 1996), the Eleventh Circuit held that a fee paid by borrowers to "expedit[e] the [lender's] pay outs to . . . other financial institutions" via Federal Express was not a finance charge because the borrowers could have "avoid[ed]" the "fee by having the documents sent via regular mail" instead. *Id.* at 579. "Since the [borrowers] could have chosen not to pay the Federal Express fee and the bank did not require it," the court explained, the "fee was not imposed as an incident to the extension of credit." *Id.*

The Federal Reserve Board's guidance on credit cards—upon which the CFPB's Advisory Opinion relies—is likewise instructive. In a 2003 rulemaking, the Board considered whether a fee for expedited delivery of a credit card constitutes a finance charge. *See* 68 Fed. Reg. 16185, 16186 (Apr. 3, 2003). The Board answered that question in the negative: "[A] fee for expedited delivery of a credit card is not incidental to the extension of credit and thus is not a finance charge where the consumer requests the service and the card is also available by standard mail service (or another means that is at least as fast) without a fee." *Id.* at 16187; *accord* 90 Fed. Reg. at 60075 (relying on this rule). Just as an optional express delivery fee for a credit card is not a finance charge where the same card

"is also available by standard mail," 68 Fed. Reg. at 16187, an optional express delivery fee for an advance is not a finance charge where the same advance is also available through standard ACH transfer.

d. Finally, the statutory structure points in the same direction. TILA and Regulation Z list several examples of charges that qualify as "finance charges." *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(b). None of the enumerated examples resembles an optional fee that is paid simply for faster delivery of credit. *See* 15 U.S.C. § 1605(a) (listing, *e.g.*, "interest," "loan fee," "finder's fee," and "fee for an investigation or credit report" as examples of "finance charge[s]"); 12 C.F.R. § 1026.4 (similar); *see also Pfennig*, 541 U.S. at 241 (emphasizing that "none of § 1605's specific examples of charges" resemble "over-limit or comparable fees"). That makes sense because "finance charge" ultimately means "the cost of consumer credit." 12 C.F.R. § 1026.4. And a fee that a consumer does not need to pay to obtain credit is not naturally viewed as part of "the true cost of [that] credit." *Pfennig*, 541 U.S. at 243.

Classifying optional fees as "finance charges" would also undermine a key aim of TILA and the MLA: facilitating the "informed use of credit." 15 U.S.C. § 1601(a); *see* 10 U.S.C. § 987(c)(1)(B). Indeed, requiring

the disclosure of optional fees as part of the "cost of consumer credit," 12 C.F.R. § 1026.4, risks confusing consumers—who may mistakenly think that those fees must be paid to obtain credit. Conversely, restricting the meaning of "finance charge" to required fees alone would create "a clear, easy to apply (and easy to enforce) rule" that accords with reasonable consumer expectations. *Pfennig*, 541 U.S. at 245.

### 2. The district court's contrary reasoning lacks merit.

The district court never engaged with the meaning of "imposed" or "incident to" and thus never explained how a putative creditor could impose an optional express delivery fee or tip as an incident to an extension of credit. *See* SPA7-8. Instead, the court simply asserted that, "[a]s alleged," "at least the expedite fee plausibly represents a charge [MoneyLion] imposed on [Plaintiffs] (and other [MoneyLion] users) 'as an incident to or a condition of the extension of credit.'" SPA8 (alterations in original) (citation omitted). But again, the court applied the wrong legal standard by asking what plaintiffs had "plausibly" "alleged." SPA8. As noted above, district courts must "apply a 'standard similar to that applicable for a motion for summary judgment'"—not a motion to

57

dismiss—when "deciding motions to compel arbitration." *Soliman*, 999 F.3d at 833 (citations omitted).

The district court also stated that "[t]he [complaint] describes in detail how Turbo Fees and Tips are part and parcel of the overwhelming majority of Instacash advances." SPA7. But even assuming that Instacash users regularly opt for express delivery or tips, that does not establish that MoneyLion "*imposed*" those choices on users. For instance, if most of a clothing store's online customers choose to pay extra for overnight shipping of their garments, no one would assume that the store imposed the overnight-shipping fee on the customers. And if most coffee shop customers tip the barista, no one would assume that the shop required them to do so. The same logic applies here.

The district court further stated that "customers are unlikely to choose to use a payday advance service without an instant delivery feature, as waiting five days for payment to process would defeat the purpose of early wage access." SPA7. But the question is not whether MoneyLion makes "an instant delivery feature" available, SPA7; it is whether MoneyLion "*imposes*" that feature on users as an "incident to" Instacash advances. As explained above, it does not. Nor is standard

58

delivery inconsistent with "the purpose of early wage access." SPA7. Free standard advances arrive within 1-5 business days, *see* JA136—which is substantially faster than the typical two-week payroll cycle. Thus, a person who chooses the free standard delivery option still enjoys the benefits "of early wage access." SPA7. And the same person may choose free standard delivery for certain advances and express delivery for others.

Indeed, the district court confused the method of delivery with the substance of the product. With or without express delivery, the substance of an Instacash advance is the same: an advance on a portion of already-earned wages. Payment of the express delivery fee simply changes the *speed* of delivery—with free standard delivery, the money arrives within 1-5 business days, and with an express fee, the money generally arrives within minutes. *See* JA136; *Veale*, 85 F.3d at 579. If a gift card is delivered within 3 business days in the normal course, or 1 business day for a fee, the recipient gets the same gift card either way. The express delivery fee does not transform the product itself.

59

In addition, the district court again relied on the *Orubo* line of cases discussed earlier. *See* SPA8 (citing, *e.g.*, *Orubo*, 780 F. Supp. 3d at 938; *Vickery*, 2025 WL 2841686, at *6-7). But those cases are just as poorly reasoned on the "finance charge" issue as on the "credit" issue. To start, those cases never meaningfully address (or even acknowledge) the meaning of the term "imposed" when they assert that "[a] charge need not be mandatory to be 'incident to the extension of credit' and thus constitute a 'finance charge' under TILA." *Orubo*, 780 F. Supp. 3d at 937; *see Vickery*, 2025 WL 2841686, at *6-7 (same). Disregarding the key term—here, "imposed"—is a recipe for an erroneous interpretation.

The *Orubo* line of decisions misunderstands not only text, but also precedent. As noted, *Pfennig* construes "incident to" as requiring a "*necessary* connection" between the relevant fee and the extension of credit. 541 U.S. at 241. Yet according to *Orubo*, *Pfennig* "confirmed that 'incident to' means 'connected to.'" *Orubo*, 780 F. Supp. 3d at 937. *Orubo* thus reads the term "necessary" out of *Pfennig*'s formulation. That reading contradicts *Pfennig* itself, because "there [was] at least some connection between the over-limit fee" there and "an extension of credit"—and yet the Court held that "the best interpretation of the term

60

'finance charge' may exclude over-limit fees." 541 U.S. at 240, 242. Moreover, if the phrase "incident to" transformed all charges with *any* connection to the extension of credit into finance charges, then there would have been no need for TILA and Regulation Z to carefully enumerate examples of finance charges. *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(b). Accordingly, *Orubo*'s interpretation would "render[] superfluous" key parts of the statute and regulation. *N.Y. Legal Assistance Grp. v. BIA*, 987 F.3d 207, 217 (2d Cir. 2021) (citation omitted).

*Orubo* additionally relies on an inapposite 1996 Federal Reserve Board rule addressing a distinct type of offering: debt-cancellation products. 780 F. Supp. 3d at 937 (citing 61 Fed. Reg. 49237 (Sept. 19, 1996)). Even if that rule were relevant to EWA, it would now be obsolete given the CFPB's 2025 Advisory Opinion. Indeed, the Advisory Opinion expressly rejects the analogy between express delivery fees and "fees charged for debt cancellation agreements." 90 Fed. Reg. at 60075. For good reason: "debt cancellation coverage is a feature of the loan affecting the total price paid for the credit," and thus constitutes "part of the cost of credit." 61 Fed. Reg. at 49239. By contrast, optional express delivery

61

fees do not affect the amount of an Instacash advance and therefore cannot be viewed as part of the cost of credit.[9]

Finally, *Orubo* asserts that payment of an express delivery fee "is a necessary condition" to receiving "the credit 'within minutes.'" 780 F. Supp. 3d at 938 (citation omitted). That assertion is circular. A user of course must generally pay an express delivery fee to obtain express delivery. But the putative "extension of credit" here is an Instacash advance—and no fee is necessary to obtain that extension of credit. In any event, *Orubo*'s assertion is inconsistent with MoneyLion's Terms. As explained above, a user can select express delivery, receive an advance within minutes, and avoid ever paying the fee (or repaying the advance) by revoking the debit authorization. Thus, an express delivery fee is in fact *not* a "necessary condition" of even expedited delivery. *Orubo*, 780 F. Supp. 3d at 938.

---

[9] *Orubo*'s reliance on inapposite sources does not end there: It also draws on a never-finalized CFPB "proposed interpretive rule" that the agency has since withdrawn and repudiated. 780 F. Supp. 3d at 937 (citing 89 Fed. Reg. 61358 (July 31, 2024)); *see* 90 Fed. Reg. at 60076 n.81 (withdrawing and rejecting the proposed interpretive rule).

## II. AT MINIMUM, THE MLA DOES NOT PRECLUDE ARBITRATION OF PLAINTIFFS' NON-MLA CLAIMS

For the foregoing reasons, the district court should have granted MoneyLion's motion to compel in its entirety. At the very least, however, the court should have compelled arbitration of plaintiffs' TILA, Georgia law, and Illinois law claims.

The district court held that "the *MLA's* explicit prohibition on submitting consumer credit agreements to arbitration applies to this case." SPA10 (emphasis added). Yet the court denied MoneyLion's motion to compel arbitration of not only plaintiffs' MLA claim, but also their TILA and state-law claims. SPA10. Nothing in Section 987(f)(4) of the MLA suggests—let alone makes "clear"—that Congress sought to bar arbitration of claims arising outside the MLA itself. *Epic Sys.*, 584 U.S. at 510 (citation omitted). And that counterintuitive proposition is inconsistent with a recent Fourth Circuit decision. *See Espin v. Citibank, N.A.*, 126 F.4th 1010, 1016, 1020 (4th Cir. 2025) (compelling arbitration of Servicemembers Civil Relief Act claims regarding "interest on military members' credit obligations" while remanding for further consideration of MLA claims).

63

Plaintiffs may argue that Section 987(f)(4)'s reference to "any dispute involving the extension of consumer credit" encompasses consumer credit disputes arising under statutes other than the MLA. 10 U.S.C. § 987(f)(4). But in context, Section 987(f)(4)'s prohibition applies only to claims brought under Section 987, which imposes limitations on the "[t]erms of *consumer credit extended* to [service]members and dependents." 10 U.S.C. § 987 (emphasis added). The MLA Rule confirms the point by precluding enforcement only of "agreement[s] to arbitrate any dispute involving the extension of consumer credit to a covered borrower *pursuant to this part*." 32 C.F.R. § 232.9(d) (emphasis added). Section 987(f)(4) does not apply to distinct statutes and claims, no matter how far removed from the MLA. Accordingly, this Court should at minimum reverse the district court's decision denying arbitration of Plaintiffs' TILA, Georgia law, and Illinois law claims.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order denying MoneyLion's motion to compel arbitration.

64

Dated: June 3, 2026                    Respectfully submitted,

                                       /s/ Ephraim A. McDowell
JONATHAN Y. ELLIS                      EPHRAIM A. MCDOWELL
MCGUIREWOODS LLP                         Counsel of Record
501 Fayetteville Street, Suite 500     COOLEY LLP
Raleigh, NC 27601                      1299 Pennsylvania Avenue NW
(919) 755-6688                         Suite 700
                                       Washington, DC 20004
                                       (202) 842-7800
GRACE GREENE SIMMONS                   emcdowell@cooley.com
MCGUIREWOODS LLP
1075 Peachtree Street, NE
35th Floor                             JAMES KIM
Atlanta, GA 30309                      KAITLAND KENNELLY
(404) 443-5718                         HUGH HAMILTON
                                       COOLEY LLP
                                       55 Hudson Yards
                                       New York, NY 10001-2157
                                       (212) 479-6000


*Counsel for Defendant-Appellant MoneyLion*

# CERTIFICATE OF COMPLIANCE

## No. 26-655

This brief complies with the type-volume limitation set forth in Local Rules 29.1(c) and 32.1(4) of the United States Court of Appeals for the Second Circuit because it contains 12,778 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: June 3, 2026                    Respectfully submitted,

                                       */s/ Ephraim A. McDowell*
                                       Ephraim A. McDowell

66

## CERTIFICATE OF SERVICE

I hereby certify that, on June 3, 2026, I electronically filed the foregoing Brief of Defendant-Appellant MoneyLion with the United States Court of Appeals for the Second Circuit using the Court's electronic filing system, which will serve copies on all registered counsel.

Dated: June 3, 2026                  */s/ Ephraim A. McDowell*
                                      Ephraim A. McDowell

# 26-655

## In the United States Court of Appeals for the Second Circuit

JAMES LOWE, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, MICHAEL COLLINS, RAE FULLER,

*Plaintiffs-Appellees,*

v.

MONEYLION TECHNOLOGIES INC. D/B/A MONEYLION,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:25-CV-4098 HON. DALE E. HO

## SPECIAL APPENDIX

JONATHAN Y. ELLIS
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
(919) 755-6688

GRACE GREENE SIMMONS
MCGUIREWOODS LLP
1075 Peachtree Street, NE
35th Floor
Atlanta, GA 30309
(404) 443-5718

EPHRAIM A. MCDOWELL
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

JAMES KIM
KAITLAND M. KENNELLY
HUGH B. HAMILTON
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

| **Date** | **ECF** | **Document Description** | **Page** |
|---|---|---|---|
| 03/09/26 | 58 | Memorandum Opinion & Order............................SPA1 | |
| N/A | N/A | 9 U.S.C. § 2.........................................................SPA12 | |
| N/A | N/A | 10 U.S.C. § 987...................................................SPA13 | |
| N/A | N/A | 15 U.S.C. § 1605(a) .............................................SPA21 | |
| N/A | N/A | 12 C.F.R. § 1026.4(a)-(b) .....................................SPA22 | |
| N/A | N/A | 32 C.F.R. § 232.3(f)(1), (g)-(h), (n), (s) .................SPA26 | |
| N/A | N/A | 32 C.F.R. § 232.9(d) .............................................SPA28 | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES LOWE, individually, and on behalf of all others similarly situated,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>MONEYLION TECHNOLOGIES INC. d/b/a MONEYLION,<br><br>　　　　　　　　　　Defendant. | 25 Civ. 4098 (DEH)<br><br>**MEMORANDUM OPINION AND ORDER** |

DALE E. HO, United States District Judge:

Before the Court is a Motion to Compel Arbitration or Dismiss a purported class action led by three members of the United States Military—James Lowe, Michael Collins, and Rae Fuller—against MoneyLion Technologies Inc. ("MoneyLion"). At issue here is MoneyLion's earned wage access product "Instacash," through which MoneyLion offers short-term cash advances based on expected paychecks to be repaid when the paycheck is deposited in the user's account. The Motion hinges on one question: whether, by charging a fee for allowing consumers to obtain a portion of their paycheck early so long as they preauthorize repayment once the paycheck hits their bank account, MoneyLion extends "credit" within the meaning of various consumer protection statutes. The Court joins many others across the nation in concluding that these early payday services constitute the extension of credit and therefore **DENIES** the Motion to Dismiss or Compel Arbitration.

## BACKGROUND

The following facts are drawn from the First Amended Complaint ("FAC"), ECF No. 25, and are assumed to be true for purposes of adjudicating the Motion to Dismiss or Compel Arbitration. MoneyLion is a tech-enabled earned wage access provider. FAC ¶ 2. In what are essentially payday loans, MoneyLion allows consumers to receive short-term cash advances based

<b>SPA1</b>

on expected future paychecks. *Id.* ¶¶ 2, 72-73. Using borrower's financial and payroll data, MoneyLion offers effectively risk-free loans to customers while pre-authorizing a debit from that customer's account on the next payday for the amount of the loan, plus any fees. *Id.* ¶¶ 117-31. It is these fees that are the subject of this litigation.

MoneyLion profits on these short-term loans through (1) charging fees for expediting payment, so-called ("Turbo delivery fees") and (2) soliciting tips for offering their services. *Id.* ¶ 76. Expedited delivery fees range between $0.49-$8.99 depending on the size of the advance, which cannot exceed $100 per advance with a maximum of five advances per pay period. *Id.* ¶¶ 77-80. And tips are exactly what they sound like: pure gifts to MoneyLion solicited through default selection screens and behavioral strategies such as "implied threats and eliciting guilt." Mem. in Opp. to Mot. for Summ. J. at 5 ("Opp."), ECF No. 33 (citing FAC ¶¶ 90-99). Approximately 90% of MoneyLion transactions use expedited delivery, and roughly 40% of customers "tip" MoneyLion when they receive an advance. FAC ¶¶ 86, 100.

Because payday loans are highly regulated, MoneyLion and other earned wage access provides structure their advances differently from a traditional loan. Particularly relevant is the fine print that states "THERE IS NO OBLIGATION TO REPAY AN INSTACASH ADVANCE." Mem. in Supp. of Mot. for Summ. J. at 6 ("Mot."), ECF No. 31. And it is true: MoneyLion technically has no recourse should a consumer choose not to repay the advance by removing their payment method from the app and cancelling the preauthorized debit—a difficult, but not impossible, process. The only punishment for doing so is being kicked off the MoneyLion app. However, 98% of customers do repay the advances, limiting any impact this provision may have on MoneyLion's bottom line. FAC ¶ 145. MoneyLion also includes a requirement that users arbitrate all claims relating to Instacash advances. Mot. at 6.

2

**SPA2**

Plaintiffs each received Instacash advances while they were active-duty servicemembers. FAC ¶¶ 171-74. The Complaint estimates that the fees charged to Plaintiffs amount to annual interest rates on Instacash advances of between 280% and 1,120%. *Id.*

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6)[1], "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing the complaint, the court "must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. But the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The "FAA compels judicial enforcement of a wide range of written arbitration agreements." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)). Where a party seeks to compel arbitration, a party resisting arbitration "should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985).

---

[1] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

**SPA3**

**DISCUSSION**

Plaintiffs allege that MoneyLion's cash advance product—known as Instacash—is essentially an unregulated payday loan. The only legal dispute here is whether the fees attached to receiving Instacash advances—expedite fees and tips—convert these advances into extensions of credit with costs in excess of what is permitted by existing law, even in the absence of any ability to recover on MoneyLion's part. Plaintiffs allege violations of the Military Lending Act ("MLA"), Truth in Lending Act ("TILA"), Georgia Payday Lending Act ("GPLA"), and Illinois Predatory Loan Prevention Act ("IPLPA").

As discussed herein, the Court concludes that Plaintiffs have plausibly alleged that Instacash constitutes consumer credit: making it subject to various statutes and voiding any arbitration clauses in Plaintiffs' contract with MoneyLion. MoneyLion argues that Instacash is not consumer credit for two reasons: (1) because customers do not technically need to repay any advance and (2) the fees and tips associated with Instacash do not qualify as finance charges. The Court takes each argument in turn.

**I.  Military Lending Act and Truth in Lending Act**

**A.  Statutory Background**

The MLA and TILA establish overlapping statutory frameworks that serve to protect borrowers and allow consumers to make informed decisions when taking out loans. Both laws include certain disclosure requirements, while the MLA also includes broader substantive requirements. *See, e.g.* 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18; 10 U.S.C. § 987(c)(1)(A); 32 C.F.R. § 232.6. In addition to disclosure requirements, the MLA makes it illegal for creditors to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to" servicemembers and their dependents. 10 U.S.C. § 987(b). The MLA also provides that "no agreement to arbitrate any dispute involving the extension of

**SPA4**

consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made." *Id*. § 987(f)(4).

A key term in both of these provisions is "consumer credit." Regulations promulgated by the Department of Defense define "consumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes" that is either "[s]ubject to a finance charge" or "[p]ayable by a written agreement in more than four installments." *Burrison v, FloatMe, Corp.*, No. 25 Civ. 10885, 2026 WL 444638, at \*5 (D. Mass. Feb. 17, 2026). "Credit" is defined as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." *Id.* (citing § 232.3(h)). And a "creditor" is a person "engaged in the business of extending consumer credit" who meets the additional criteria provided in the MLA regulations. *Id*. (citing 10 U.S.C. § 987(i)(5)).

As another district court aptly summarized, a dispute involving the extension of consumer credit must include, at minimum:

(1) "credit," which is the right granted to a consumer by a creditor to

    (a) defer payment of debt or

    (b) incur debt and defer its payment;

(2) "consumer credit," meaning the "credit" is

    (a) offered to a covered borrower;

    (b) primarily for personal, family or household purposes; and

    (c)    (i) payable by a written agreement in more than four installments or

        (ii) subject to a finance charge. See 10 U.S.C. § 987(i); 32 C.F.R. § 232.3(f)-(i).

(3) a "creditor," meaning a person who, with their affiliates, extended consumer credit to covered borrowers more than twenty-five times in the preceding or current

**SPA5**

calendar year.  See 10 U.S.C. § 987(i)(5); 12 C.F.R. § 1026.2(a)(17)(v); 32 C.F.R. § 232.3(i).

*Burrison*, 2026 WL 444638, at *5.  MoneyLion does not dispute that it is a creditor; accordingly, the only questions are whether Instacash constitutes (1) credit that is (2) subject to a finance charge.

**B.      Credit**

MoneyLion first argues that Instacash advances are not "credit" based on a clever structuring of their Instacash advances.  MoneyLion only offers these payday advances when it has already verified that a paycheck is incoming for the customer and the customer agrees to preauthorize a debit from their bank account for the amount received in advance, plus any fees. FAC ¶ 133.  As a result, MoneyLion takes on essentially no risk for the amount of the cash advance and continually adjusts customers' eligibility to receive advances based on their default risk to ensure repayment.  FAC ¶¶ 125-27.  However, while a customer must agree to a preauthorized debit, it is possible for such debit to be cancelled before payday.  *Id.* ¶ 73, 134.  And in the relevant contractual provisions, MoneyLion waives all potential recourse for recovering outstanding advances.  The only punishment they can inflict, instead, is banning that customer from using Instacash in the future.  *Id.* ¶ 138.  MoneyLion argues that this no-recourse structuring of their payday advances takes their product out of the realm of consumer credit.

Every other court to have addressed this issue, however, has rejected that attempt to circumvent the relevant statutory frameworks.  As described above, "credit" includes where an individual "incur[s] debt and defer[s] its payment." 32 C.F.R. § 232.3(h).  Here, MoneyLion offers cash advances to eligible users that, in return, must authorize automated debits from their linked external bank account on the scheduled repayment date.  This Court agrees with every court to have reached the issue, and concludes that this "falls squarely within the definition of credit." *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935 (N.D. Cal. 2025) (interpreting TILA

6

**SPA6**

definition of credit as applicable where service provided cash advances "in exchange for authorization to debit a borrower's bank account immediately after their employer deposits their paycheck on payday"); *see also Burrison*, 2026 WL 444638, at *6-7 (same); *Johnson v. Activehours, Inc.*, No. 24 Civ. 2283, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025) (same); *Vickery v. Empower Fin., Inc.*, No. 25 Civ. 3675, 2025 WL 2841686, at *4-5 (N.D. Cal. Oct. 7, 2025) (similar), *appeal docketed*, No. 25-6377 (9th Cir. Oct. 9, 2025); *Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1158 (W.D. Wash. 2025) (concluding plaintiff plausibly alleged that service advanced "credit" under MLA and TILA).

### C.     Finance Charges

The MLA does not apply to just "credit:" rather, it is limited to "consumer credit."  This takes us to the second set of requirements, that credit must be of the *consumer* type, meaning the "credit" is "offered to a covered borrower, primarily for personal, family or household purposes; and (i) payable by a written agreement in more than four installments or (ii) subject to a finance charge."  *See* 10 U.S.C. § 987(i); 32 C.F.R. § 232.3(f)-(i).  Plaintiffs argue that MoneyLion's advances are "subject to a finance charge" through the Turbo fees and tips charged when a user takes out a loan.  The Court agrees.

As the several Courts noted above have described, the MLA defines a finance charge as "the cost of consumer credit as a dollar amount," including "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a).  The FAC describes in detail how Turbo Fees and Tips are part and parcel of the overwhelming majority of Instacash advances and how, for the most part, customers are unlikely to choose to use a payday advance service without an instant delivery feature, as waiting five days for payment to process would defeat the purpose of early wage access.  FAC ¶¶ 84-87.  "As alleged, the Court concludes that at least the expedite

7

**SPA7**

fee plausibly represents a charge [MoneyLion] imposed on [Plaintiffs] (and other [MoneyLion] users) 'as an incident to or a condition of the extension of credit.'" *Burrison*, 2026 WL 444638, at \*7 (citing 12 C.F.R. § 1026.4(a)); *Moss*, 799 F. Supp. 3d , at 1160 (concluding expedite and subscription fees were plausibly finance charges under MLA and TILA); *Orubo*, 780 F. Supp. 3d at 938 (concluding expedite fee constituted finance charge under TILA because time of receipt of funds is material term and "payment of the lightning fee is a necessary condition to the extension of credit on the terms being offered"); *Johnson*, 2025 WL 2299425, at \*9 (same), Vickery, 2025 WL 2841686, at \*6-7 (same).

*          *          *

Because the Court concludes that Plaintiffs adequately allege that Instacash is an extension of consumer credit, the Court concludes that Instacash is subject to the disclosure requirements of the MLA and TILA, as well as the substantive requirements of the MLA.  Accordingly, the Motion to Dismiss Counts I (MLA) and II (TILA) is **DENIED**.

## II.    State Usury Laws

### A.    GPLA

Georgia law prohibits "interest" exceeding 16% annually.  Ga. Code. Ann. § 16-17-2(a)(1)(G).  The GLPA does not define "loan," but "implicitly gives meaning to that term by its provision that it 'shall apply with respect to all transactions in which funds are advanced to be repaid at a later date.'" *Ruth v. Cherokee Funding, LLC*, 820 S.E.2d 704, 710 (Ga. 2018) (quoting O.C.G.A. § 16-17-2(b)).  Under Georgia law, "whether a given transaction is a . . . loan . . . depends, not upon the form of words used in contracting, but upon the real intent and understanding of the parties." *Pope v. Marshall*, 78 Ga. 635, 4 S.E. 116, 118 (1887).  As a Court recently explained in denying a similar motion to dismiss:

8

**SPA8**

Plaintiffs' allegations clearly show that EarnIn extends cash advances to customers with the "real intent and understanding" that those advances are to be repaid, *Pope v. Marshall*, 78 Ga. 635, 4 S.E. 116, 118 (1887), and that borrowers can only obtain advances after EarnIn takes thorough steps to ensure repayment. In fact, the circumstances under which repayment would not occur are extremely narrow—such as a borrower obtaining an advance then closing their account or changing their direct deposit instructions before payday, or managing to withdraw their paycheck on payday before EarnIn accesses it. Although the Cash Out User Agreement disavows customers' legal obligation to repay advances, that is not determinative. That the GPLA applies only to funds advanced "to be repaid at a later date" does not mean that it applies only to funds legally required to be repaid at a later date. Instead, whether funds are advanced to be repaid at a later date is determined by the shared expectations of the parties involved. "[W]hether a given transaction is a ... loan ... depends, not upon the form of words used in contracting, but upon the real intent and understanding of the parties." *Pope v. Marshall*, 78 Ga. 635, 4 S.E. 116, 118 (1887). The Georgia Supreme Court has cautioned that \*934 "[i]t is easy to imagine an agreement with a sham contingent repayment provision that reflects an attempt to evade the usury laws. And a court properly presented with a claim that a contingent repayment provision is a sham should look beyond the text of the agreement to penetrate to the substance and perhaps find an unlawful loan, notwithstanding the contingency." *Ruth*, 820 S.E.2d at 710–11.

*Orubo*, 780 F. Supp. 3d at 933-34.

The Court concludes that Plaintiffs adequately pleaded a violation of Georgia law. Plaintiffs allege that the cash advances are effectively short-term loans given the obligation to establish a pre-authorized debit on a user's bank account and the almost impossibility that the debt would not be repaid. The Court also finds MoneyLion's argument that the associated finance charges do not constitute interest unpersuasive under the broad definition of "interest" in Georgia statute. O.C.G.A. § 7-4-2 (defining "interest" as "a charge for the use of money computed over the term of the contract at the rate stated in the contract or precomputed at a stated rate on the scheduled principal balance *or* computed in *any other way or any other form*.") (emphasis added). The motion to dismiss Count III is **DENIED**.

**B.    Illinois PLPA**

Plaintiffs have also plausibly alleged a violation of the Illinois PLPA. The parties agree that the IPLPA emulates the MLA, seeking to codify the same federal regulations for a broader

9

**SPA9**

class of individuals than just service members.  The IPLPA defines "loan" broadly as "money or credit provided to a consumer in exchange for the consumer's agreement to a certain set of terms, including, but not limited to, any finance charges, interest, or other conditions."  815 ILCS 123/15-1-10.  MoneyLion concedes that, at minimum, the MLA's definition of credit applies to the IPLPA. Mot. at 25-26.  Because the Court has already concluded that Instacash is consumer credit under the MLA, the motion is **DENIED** with respect to Count IV.

## III.    Arbitration

In light of the Court's determination that Instacash is an extension of consumer credit, the Court concludes that the arbitration clause is unenforceable.  Indeed, MoneyLion concedes that this conclusion is inevitable if, as the Court held above, the Plaintiffs have adequately alleged that the MLA applies here.  Mot. at 30 ("[T]he Arbitration Agreement expressly carves out anyone who is a 'Covered Borrower' under the MLA Rule, so if the Court concludes the MLA applies here, the Arbitration Agreement will not apply.").  The Court also independently concludes that the MLA's explicit prohibition on submitting consumer credit agreements to arbitration applies to this case.  *Burrison*, 2026 WL 444638, at *4-5 (concluding MLA voids arbitration clause for extensions of consumer credit); *Consumer Fin. Prot. Bureau v. MoneyLion Techs. Inc.*, 799 F. Supp. 3d 152, 189 (S.D.N.Y 2025) (explaining that "[r]egardless of what [s]ection 987(e)(3) prohibits, [s]ection 987(f)(4) independently renders all arbitration agreements unenforceable as against military borrowers"); *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1048 (N.D. Cal. 2025) (reaching same conclusion).  Accordingly, the Motion to Compel Arbitration is **DENIED**.

**CONCLUSION**

Based on the above, Defendant's Motion to Compel Arbitration or Dismiss is **DENIED.** Within fourteen (14) days of the date of this Order, the parties shall file: (1) a status letter indicating whether they seek referral for (a) a settlement conference before a Magistrate Judge or (b)

10

**SPA10**

participation in the District's Mediation Program; and (2) a proposed Civil Case Management Plan and Scheduling Order.  The parties shall use this Court's form Proposed Civil Case Management Plan and Scheduling Order, which is also available at: https://nysd.uscourts.gov/hon-dale-e-ho.

The Clerk of Court is respectfully directed to terminate ECF No. 30.

SO ORDERED.

Dated: March 6, 2026

New York, New York

_____
DALE E. HO
United States District Judge

11

**SPA11**

## 9 U.S.C. § 2

### § 2. Validity, Irrevocability, and Enforcement of Agreements to Arbitrate

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

**SPA12**

## 10 U.S.C. § 987

## § 987. Terms of Consumer Credit Extended to Members and Dependents: Limitations

**(a)** **Interest.**—A creditor who extends consumer credit to a covered member of the armed forces or a dependent of such a member shall not require the member or dependent to pay interest with respect to the extension of such credit, except as—

    **(1)** agreed to under the terms of the credit agreement or promissory note;

    **(2)** authorized by applicable State or Federal law; and

    **(3)** not specifically prohibited by this section.

**(b)** **Annual percentage rate.**—A creditor described in subsection (a) may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member.

**(c)** **Mandatory loan disclosures.**—

    **(1)** **Information required.**—With respect to any extension of consumer credit (including any consumer credit originated or extended through the internet) to a covered member or a dependent of a covered member, a creditor shall provide to the member or dependent the following information orally and in writing before the issuance of the credit:

        **(A)** A statement of the annual percentage rate of interest applicable to the extension of credit.

        **(B)** Any disclosures required under the Truth in Lending Act (15 U.S.C. 1601 et seq.).

        **(C)** A clear description of the payment obligations of the member or dependent, as applicable.

**SPA13**

**(2) Terms.**—Such disclosures shall be presented in accordance with terms prescribed by the regulations issued by the Board of Governors of the Federal Reserve System to implement the Truth in Lending Act (15 U.S.C. 1601 et seq.).

**(d) Preemption.**—

**(1) Inconsistent laws.**—Except as provided in subsection (f)(2), this section preempts any State or Federal law, rule, or regulation, including any State usury law, to the extent that such law, rule, or regulation is inconsistent with this section, except that this section shall not preempt any such law, rule, or regulation that provides protection to a covered member or a dependent of such a member in addition to the protection provided by this section.

**(2) Different treatment under State law of members and dependents prohibited.**—States shall not—

**(A)** authorize creditors to charge covered members and their dependents annual percentage rates of interest for any consumer credit or loans higher than the legal limit for residents of the State; or

**(B)** permit violation or waiver of any State consumer lending protections covering consumer credit for the benefit of residents of the State on the basis of nonresident or military status of a covered member or dependent of such a member, regardless of the member's or dependent's domicile or permanent home of record.

**(e) Limitations.**—It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which—

**(1)** the creditor rolls over, renews, repays, refinances, or consolidates any consumer credit extended to the borrower by the same creditor with the proceeds of other credit extended to the same covered member or a dependent;

**SPA14**

**(2)** the borrower is required to waive the borrower's right to legal recourse under any otherwise applicable provision of State or Federal law, including any provision of the Servicemembers Civil Relief Act (50 U.S.C. 3901 et seq.);

**(3)** the creditor requires the borrower to submit to arbitration or imposes onerous legal notice provisions in the case of a dispute;

**(4)** the creditor demands unreasonable notice from the borrower as a condition for legal action;

**(5)** the creditor uses a check or other method of access to a deposit, savings, or other financial account maintained by the borrower, or the title of a vehicle as security for the obligation;

**(6)** the creditor requires as a condition for the extension of credit that the borrower establish an allotment to repay an obligation; or

**(7)** the borrower is prohibited from prepaying the loan or is charged a penalty or fee for prepaying all or part of the loan.

**(f)** **Penalties and remedies.—**

**(1)** **Misdemeanor.—**A creditor who knowingly violates this section shall be fined as provided in title 18, or imprisoned for not more than one year, or both.

**(2)** **Preservation of other remedies.—**The remedies and rights provided under this section are in addition to and do not preclude any remedy otherwise available under law to the person claiming relief under this section, including any award for consequential and punitive damages.

**(3)** **Contract void.—**Any credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract.

**(4)** **Arbitration.—**Notwithstanding section 2 of title 9, or any other Federal or State law, rule, or regulation, no agreement

**SPA15**

to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made.

**(5)** **Civil liability.**—

**(A)** **In general.**—A person who violates this section with respect to any person is civilly liable to such person for—

**(i)** any actual damage sustained as a result, but not less than $500 for each violation;

**(ii)** appropriate punitive damages;

**(iii)** appropriate equitable or declaratory relief; and

**(iv)** any other relief provided by law.

**(B)** **Costs of the action.**—In any successful action to enforce the civil liability described in subparagraph (A), the person who violated this section is also liable for the costs of the action, together with reasonable attorney fees as determined by the court.

**(C)** **Effect of finding of bad faith and harassment.**—In any successful action by a defendant under this section, if the court finds the action was brought in bad faith and for the purpose of harassment, the plaintiff is liable for the attorney fees of the defendant as determined by the court to be reasonable in relation to the work expended and costs incurred.

**(D)** **Defenses.**—A person may not be held liable for civil liability under this paragraph if the person shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. Examples of a bona fide error include clerical, calculation,

**SPA16**

computer malfunction and programming, and printing errors, except that an error of legal judgment with respect to a person's obligations under this section is not a bona fide error.

**(E) Jurisdiction, venue, and statute of limitations.**— An action for civil liability under this paragraph may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of—

**(i)** two years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or

**(ii)** five years after the date on which the violation that is the basis for such liability occurs.

**(6) Administrative enforcement.**—The provisions of this section (other than paragraph (1) of this subsection) shall be enforced by the agencies specified in section 108 of the Truth in Lending Act (15 U.S.C. 1607) in the manner set forth in that section or under any other applicable authorities available to such agencies by law.

**(g) Servicemembers Civil Relief Act protections unaffected.**— Nothing in this section may be construed to limit or otherwise affect the applicability of section 207 of the Servicemembers Civil Relief Act (50 U.S.C. 3937).

**(h) Regulations.**—

**(1)** The Secretary of Defense shall prescribe regulations to carry out this section.

**(2)** Such regulations shall establish the following:

**(A)** Disclosures required of any creditor that extends consumer credit to a covered member or dependent of such a member.

**SPA17**

**(B)** The method for calculating the applicable annual percentage rate of interest on such obligations, in accordance with the limit established under this section.

**(C)** A maximum allowable amount of all fees, and the types of fees, associated with any such extension of credit, to be expressed and disclosed to the borrower as a total amount and as a percentage of the principal amount of the obligation, at the time at which the transaction is entered into.

**(D)** Definitions of "creditor" under paragraph (5) and "consumer credit" under paragraph (6) of subsection (i), consistent with the provisions of this section.

**(E)** Such other criteria or limitations as the Secretary of Defense determines appropriate, consistent with the provisions of this section.

**(3)** In prescribing regulations under this subsection, and not less often than once every two years thereafter, the Secretary of Defense shall consult with the following:

**(A)** The Federal Trade Commission.

**(B)** The Board of Governors of the Federal Reserve System.

**(C)** The Office of the Comptroller of the Currency.

**(D)** The Federal Deposit Insurance Corporation.

**(E)** The Bureau of Consumer Financial Protection.

**(F)** The National Credit Union Administration.

**(G)** The Treasury Department.

**(i)** **Definitions.**—In this section:

**(1)** **Covered member.**—The term "covered member" means a member of the armed forces who is—

**SPA18**

**(A)** on active duty under a call or order that does not specify a period of 30 days or less; or

**(B)** on active Guard and Reserve Duty.

**(2)** **Dependent.**—The term "dependent", with respect to a covered member, means a person described in subparagraph (A), (D), (E), or (I) of section 1072(2) of this title.

**(3)** **Interest.**—The term "interest" includes all cost elements associated with the extension of credit, including fees, service charges, renewal charges, credit insurance premiums, any ancillary product sold with any extension of credit to a servicemember or the servicemember's dependent, as applicable, and any other charge or premium with respect to the extension of consumer credit.

**(4)** **Annual percentage rate.**—The term "annual percentage rate" has the same meaning as in section 107 of the Truth and Lending Act (15 U.S.C. 1606), as implemented by regulations of the Board of Governors of the Federal Reserve System. For purposes of this section, such term includes all fees and charges, including charges and fees for single premium credit insurance and other ancillary products sold in connection with the credit transaction, and such fees and charges shall be included in the calculation of the annual percentage rate.

**(5)** **Creditor.**—The term "creditor" means a person—

**(A)** who—

**(i)** is engaged in the business of extending consumer credit; and

**(ii)** meets such additional criteria as are specified for such purpose in regulations prescribed under this section; or

**(B)** who is an assignee of a person described in subparagraph (A) with respect to any consumer credit extended.

**SPA19**

**(6)** **Consumer credit.**—The term "consumer credit" has the meaning provided for such term in regulations prescribed under this section, except that such term does not include (A) a residential mortgage, or (B) a loan procured in the course of purchasing a car or other personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured.

**15 U.S.C. § 1605(a)**

**§ 1605. Determination of Finance Charge**

**(a)   "Finance charge" defined**

Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction. The finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges. Examples of charges which are included in the finance charge include any of the following types of charges which are applicable:

> **(1)**   Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.
>
> **(2)**   Service or carrying charge.
>
> **(3)**   Loan fee, finder's fee, or similar charge.
>
> **(4)**   Fee for an investigation or credit report.
>
> **(5)**   Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.
>
> **(6)**   Borrower-paid mortgage broker fees, including fees paid directly to the broker or the lender (for delivery to the broker) whether such fees are paid in cash or financed.

*      *      *

**SPA21**

**12 C.F.R. § 1026.4(a)-(b)**

### § 1026.4. Finance Charge

**(a)** Definition. The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

    **(1)** Charges by third parties. The finance charge includes fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor:

        **(i)** Requires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can choose the third party; or

        **(ii)** Retains a portion of the third-party charge, to the extent of the portion retained.

    **(2)** Special rule; closing agent charges. Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor:

        **(i)** Requires the particular services for which the consumer is charged;

        **(ii)** Requires the imposition of the charge; or

        **(iii)** Retains a portion of the third-party charge, to the extent of the portion retained.

    **(3)** Special rule; mortgage broker fees. Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the

**SPA22**

consumer to use a mortgage broker and even if the creditor does not retain any portion of the charge.

**(b)** Examples of finance charges. The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:

**(1)** Interest, time price differential, and any amount payable under an add-on or discount system of additional charges.

**(2)** Service, transaction, activity, and carrying charges, including any charge imposed on a checking or other transaction account (except a prepaid account as defined in § 1026.61 or a covered asset account as that term is defined in § 1026.62) to the extent that the charge exceeds the charge for a similar account without a credit feature.

**(3)** Points, loan fees, assumption fees, finder's fees, and similar charges.

**(4)** Appraisal, investigation, and credit report fees.

**(5)** Premiums or other charges for any guarantee or insurance protecting the creditor against the consumer's default or other credit loss.

**(6)** Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.

**(7)** Premiums or other charges for credit life, accident, health, or loss-of-income insurance, written in connection with a credit transaction.

**(8)** Premiums or other charges for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction.

**SPA23**

**(9)** Discounts for the purpose of inducing payment by a means other than the use of credit.

**(10)** Charges or premiums paid for debt cancellation or debt suspension coverage written in connection with a credit transaction, whether or not the coverage is insurance under applicable law.

**(11)** With regard to a covered separate credit feature and an asset feature on a prepaid account that are both accessible by a hybrid prepaid-credit card as defined in § 1026.61:

    **(i)** Any fee or charge described in paragraphs (b)(1) through (10) of this section imposed on the covered separate credit feature, whether it is structured as a credit subaccount of the prepaid account or a separate credit account.

    **(ii)** Any fee or charge imposed on the asset feature of the prepaid account to the extent that the amount of the fee or charge exceeds comparable fees or charges imposed on prepaid accounts in the same prepaid account program that do not have a covered separate credit feature accessible by a hybrid prepaid-credit card.

**(12)** With regard to a covered asset account as that term is defined in § 1026.62(b)(2):

    **(i)** Any service, transaction, activity, or carrying charge imposed on the separate credit account required by § 1026.62(c); and

    **(ii)** Any service, transaction, activity, or carrying charge imposed on the covered asset account to the extent that the charge exceeds a comparable charge imposed on a checking or other transaction account that does not have overdraft credit.

    **(iii)** For purposes of paragraph (b)(12)(ii) of this section, a charge or combination of charges, including a per

**SPA24**

transaction fee, imposed on a covered asset account when overdraft credit is extended is not comparable to the following fees or charges imposed on a checking or other transaction account that does not have overdraft credit:

**(A)** A charge for authorizing or paying a transaction that overdraws the checking or other transaction account.

**(B)** A charge for declining to authorize or pay a transaction.

**(C)** A charge for returning a transaction unpaid.

**(D)** A charge for transferring funds into the checking or other transaction account from any credit account.

**(E)** A charge for transferring funds into the checking or other transaction account from any other asset account.

\*      \*      \*

**SPA25**

## 32 C.F.R. § 232.3(f)(1), (g)-(h), (n), (s)

### § 232.3.  Definitions

As used in this part:

\* \* \*

**(f)(1)** Consumer credit means credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is:

   **(i)** Subject to a finance charge; or

   **(ii)** Payable by a written agreement in more than four installments.

\* \* \*

**(g)(1)** Covered borrower means a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a covered member (as defined in paragraph (g)(2) of this section) or a dependent (as defined in paragraph (g)(3) of this section) of a covered member.

  **(2)** The term "covered member" means a member of the armed forces who is serving on—

   **(i)** Active duty pursuant to title 10, title 14, or title 32, United States Code, under a call or order that does not specify a period of 30 days or fewer; or

   **(ii)** Active Guard and Reserve duty, as that term is defined in 10 U.S.C. 101(d)(6).

  **(3)** The term "dependent" with respect to a covered member means a person described in subparagraph (A), (D), (E), or (I) of 10 U.S.C. 1072(2).

**SPA26**

**(4)** Notwithstanding paragraph (g)(1) of this section, covered borrower does not mean a consumer who (though a covered borrower at the time he or she became obligated on a consumer credit transaction or established an account for consumer credit) no longer is a covered member (as defined in paragraph (g)(2) of this section) or a dependent (as defined in paragraph (g)(2) of this section) of a covered member.

**(h)** Credit means the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment.

*       *       *

**(n)** Finance charge has the same meaning as "finance charge" in Regulation Z.

*       *       *

**(s)** Regulation Z means any rules, or interpretations thereof, issued by the Bureau to implement the Truth in Lending Act, as amended from time to time, including any interpretation or approval issued by an official or employee duly authorized by the Bureau to issue such interpretations or approvals. However, for any provision of this part requiring a creditor to comply with Regulation Z, a creditor who is subject to Regulation Z (12 CFR part 226) issued by the Board of Governors of the Federal Reserve System must continue to comply with 12 CFR part 226. Words that are not defined in this part have the same meanings given to them in Regulation Z (12 CFR part 1026) issued by the Bureau, as amended from time to time, including any interpretation thereof by the Bureau or an official or employee of the Bureau duly authorized by the Bureau to issue such interpretations. Words that are not defined in this part or Regulation Z, or any interpretation thereof, have the meanings given to them by State or Federal law.

*       *       *

**SPA27**

**32 C.F.R. § 232.3(d)**

## § 232.9.  Penalties and Remedies

\*     \*     \*

**(d)**    Arbitration. Notwithstanding 9 U.S.C. 2, or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit to a covered borrower pursuant to this part shall be enforceable against any covered borrower, or any person who was a covered borrower when the agreement was made.

**SPA28**