# 26-655

## In the United States Court of Appeals for the Second Circuit

JAMES LOWE, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, MICHAEL COLLINS, RAE FULLER,

*Plaintiffs-Appellees,*

v.

MONEYLION TECHNOLOGIES INC. D/B/A MONEYLION,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:25-CV-4098
HON. DALE E. HO

## REPLY BRIEF OF DEFENDANT-APPELLANT MONEYLION


JONATHAN Y. ELLIS
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
(919) 755-6688

GRACE GREENE SIMMONS
MCGUIREWOODS LLP
1075 Peachtree Street, NE
35th Floor
Atlanta, GA 30309
(404) 443-5718

EPHRAIM A. MCDOWELL
*Counsel of Record*
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800

JAMES KIM
KAITLAND KENNELLY
HUGH HAMILTON
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

*Counsel for Defendant-Appellant MoneyLion*

# TABLE OF CONTENTS

PAGE


INTRODUCTION .......... 1

ARGUMENT .......... 2

I. Plaintiffs Misunderstand The Legal Standard .......... 3

II. Plaintiffs' Claims Are Arbitrable Because They Do Not Involve The Extension Of Credit .......... 5

A. Plaintiffs' Amorphous Reading Of "Debt" Disregards Text And Context .......... 6

B. Users Incur No Debt To MoneyLion Because They Have No Obligation To Repay Any Advance .......... 11

1. A revocable debit authorization does not create a repayment obligation. .......... 12

2. MoneyLion has no recourse if a user chooses not to repay an advance. .......... 16

3. Instacash is a no-recourse, no-obligation service in both form and substance. .......... 17

C. Agency Interpretations And Analogies To Other Products Confirm That Instacash Is Not Credit .......... 18

III. Plaintiffs' Claims Are Also Arbitrable Because Advances Are Not Subject To A Finance Charge .......... 23

A. Optional Express Delivery Fees Are Not "Imposed" By MoneyLion On Users .......... 23

B. Plaintiffs Misconstrue The Phrase "Incident To" .......... 27

C. Other Interpretive Tools Confirm That Express Delivery Fees Are Not Finance Charges .......... 31

IV. The MLA Does Not Bar Arbitration Of Plaintiffs' Non-MLA Claims .......... 35

CONCLUSION .......... 37

## TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36 (2d Cir. 2012) .......... 9

*Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) .......... 3

*Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995) .......... 17

*Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232 (2004) .......... 28, 29

*Kisor v. Wilkie*, 588 U.S. 558 (2019) .......... 18

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......... 20

*Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998) .......... 23

*Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552 (1990) .......... 9

*Powell v. Ocwen Fin. Corp.*, 173 F.4th 386 (2d Cir. 2026) .......... 9

*Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93 (2012) .......... 9

*SE Prop. Holdings, LLC v. Bank of Franklin*, 280 So. 3d 1047 (Ala. 2019) .......... 14

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828 (2d Cir. 2021) .......... 4

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re SVB Fin. Grp.*,
__ F.4th __, 2026 WL 2648091 (2d Cir. Sept. 9, 2026) ........................ 9

*Turner v. E-Z Check Cashing of Cookeville, TN, Inc.*,
35 F. Supp. 2d 1042 (M.D. Tenn. 1999) ............................................. 21

*United States v. Martin*,
974 F.3d 124 (2d Cir. 2020) ................................................................ 25

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ............................................................................ 30

*Veale v. Citibank, F.S.B.*,
85 F.3d 577 (11th Cir. 1996) ......................................................... 29, 30

*W. Va. Univ. Hosp. v. Casey*,
499 U.S. 83 (1991) .............................................................................. 17

*Wong v. Blanche*,
__ F.4th __, 2026 WL 2416711 (2d Cir. Aug. 19, 2026) ...................... 20

**Statutes**

9 U.S.C.
§ 2 ............................................................................................................ 3
§ 16(a) ....................................................................................................... 3
§ 402(a) ............................................................................................. 5, 36

10 U.S.C. § 987(f)(4) ........................................................................ *passim*

15 U.S.C. § 1605(a) .......................................................................... *passim*

Ark. Code Ann. § 23-52-202(7)(A) ......................................................... 27

Kan. Stat. Ann. § 9-2402(i) ..................................................................... 27

Nev. Rev. Stat. § 604D.100(1)(a) ............................................................ 27

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

S.C. Code Ann. § 39-5-820(7)(a) .......... 27

Utah Code Ann. § 13-78-101(5)(a) .......... 27

**Rules & Regulations**

12 C.F.R.
§ 1026.2(a)(13) .......... 7
§ 1026.4 .......... 32
§ 1026.4(a) .......... 30
§ 1026.4(b) .......... 29
§ 1026.4(d)(1) .......... 31
§ 1026.4(d)(1)(i) .......... 31
§ 1026.17(c)(1) .......... 7

12 C.F.R. pt. 1026, Supp. I .......... 20

32 C.F.R.
§ 232.3(f)(1) .......... 3, 32
§ 232.3(f)(1)(i) .......... 3, 23
§ 232.3(h) .......... 6
§ 232.3(n) .......... 32
§ 232.3(s) .......... 10
§ 232.9(d) .......... 35

61 Fed. Reg. 49237 (Sept. 19, 1996) .......... 34

65 Fed. Reg. 17129 (Mar. 31, 2000) .......... 21

68 Fed. Reg. 16185 (Apr. 3, 2003) .......... 33

80 Fed. Reg. 43560 (July 22, 2015) .......... 22

90 Fed. Reg. 60069 (Dec. 23, 2025) .......... *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Other Authorities**

CFPB, *Payday Loans and Deposit Advance Products* (Apr. 24, 2013) .......... 22

Black's Law Dictionary (4th rev. ed. 1968)
*Debt* .......... 8
*Legal debts* .......... 8

Merriam-Webster Online
*Interest* .......... 32
*Owe* .......... 19

Webster's Seventh New Collegiate Dictionary (1967)
*Impose* .......... 23-24

Webster's New Twentieth Century Dictionary (1965)
*Charge* .......... 25

Fifth Third, *Terms & Conditions Applicable to Fifth Third MyAdvance* (Aug. 10, 2026) .......... 22

## INTRODUCTION

MoneyLion's Instacash service allows users to obtain an advance of their earned income, choose not to repay, and walk away with no strings attached. And Instacash users can obtain those advances well before their ordinary payroll cycle without paying any fee. As a matter of plain meaning and common sense, Instacash is not an "extension of consumer credit"—which the Consumer Financial Protection Bureau (CFPB) recently recognized.

Seeking to distract from MoneyLion's clear Terms, plaintiffs mischaracterize Instacash through pejorative and misleading labels. They claim that "MoneyLion is a tech-enabled payday lender" that charges "loan-shark interest rates." Response Brief (RB) 1, 5. And they assert that Instacash is a "cunning device[]" to "evade[]" "usury limitations." RB40 (citation omitted). None of this is true.

A comparison between Instacash and payday loans illustrates the point. With payday loans, borrowers must repay the borrowed sum (with interest) or else face debt collection, late fees, and adverse credit reporting. With Instacash, users *need not* repay anything—and if they choose not to repay, no debt collection, fees, or credit reporting will follow.

With payday loans, borrowers avoid defaulting by rolling over the loan—for a fee and with interest capitalized into the new loan—thus creating snowballing debt. With Instacash, users cannot roll over an advance and are disallowed from obtaining further advances until repayment occurs—the opposite of "a debt trap." RB13.

Instacash is thus fundamentally distinct from payday loans and other extensions of credit and should not be regulated as such. MoneyLion and other earned wage access (EWA) providers have created a consumer-friendly service to help people cover short-term liquidity needs while they wait for their next paycheck. That is not a cunning device to evade usury; it is an innovative solution to a serious problem that countless Americans face. Rather than stretching inapposite federal lending statutes to cover EWA, this Court should read those statutes as written—to cover only extensions of consumer credit. States and Congress can then address EWA through regulatory frameworks tailored to the unique features of the service.

## ARGUMENT

The claims here must be arbitrated. The parties agreed to arbitration, and the Federal Arbitration Act (FAA) makes that

agreement "valid, irrevocable, and enforceable." 9 U.S.C. § 2. To avoid that result, plaintiffs cite 10 U.S.C. § 987(f)(4) of the Military Lending Act (MLA), which bars arbitration of "any dispute involving the extension of consumer credit" to a covered servicemember. But that provision has no application here for two reasons. First, Instacash advances do not extend "credit." 32 C.F.R. § 232.3(f)(1). Second, even if they did, that extension of credit would not be "[s]ubject to a finance charge." *Id.* § 232.3(f)(1)(i). Thus, Section 987(f)(4) provides no valid defense to arbitration of plaintiffs' claims.[1]

## I. PLAINTIFFS MISUNDERSTAND THE LEGAL STANDARD

The district court misapplied the relevant legal standard, and plaintiffs err in contending otherwise. The only issue on appeal is whether the court erred in denying MoneyLion's motion to compel

[1] This Court has appellate jurisdiction under the FAA, which grants parties an automatic right to file an interlocutory appeal following the denial of a motion to compel arbitration. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023); 9 U.S.C. § 16(a). Plaintiffs' only argument against appellate jurisdiction is that Section 987(f)(4) of the MLA "[o]verrides the FAA." RB23. Accordingly, plaintiffs' entire case—whether framed as a jurisdictional argument or an MLA argument—turns on whether Instacash "involve[s] the extension of consumer credit." 10 U.S.C. § 987(f)(4).

arbitration. JA188; Dkt. No. 14 at 30. "Courts deciding motions to compel arbitration 'apply a standard similar to that applicable for a motion for summary judgment,'" in which they "consider[] all relevant, admissible evidence submitted by the parties." *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833-34 (2d Cir. 2021) (citation omitted).

The district court did not do that here. Plaintiffs assert (at 51) that there is no "evidence [that] the court failed to consider." But as the opening brief explains (at 34)—and as plaintiffs appear to concede (at 51 n.20)—the court never considered MoneyLion's FAQs, which specify in detail how users may revoke their debit authorization, JA181, 186. Those FAQs belie the Complaint's allegations that revocation is "poorly explained, not highlighted, and difficult to navigate." JA42. Because the court applied the wrong legal standard to MoneyLion's motion to compel arbitration, at least vacatur and remand is warranted.

Plaintiffs nonetheless insist that "[t]he Order should be affirmed because [they] *plausibly alleged*" that Instacash advances are extensions of consumer credit. RB22 (emphasis added). And the district court likewise focused only on what "Plaintiffs have *plausibly alleged*." SPA4

(emphasis added). But that plausible-allegation standard governs motions to dismiss—not motions to compel arbitration. Opening Brief (OB) 32. Nor does the MLA suggest that allegations alone suffice to trigger Section 987(f)(4). In contrast, Congress enacted arbitration bars in other statutes that turn on mere allegations. *See* 9 U.S.C. § 402(a) (rendering arbitration agreements unenforceable in cases "*alleging* conduct constituting a sexual harassment dispute" (emphasis added)).

To be sure, plaintiffs correctly note (at 50) that "*MoneyLion* invoked the Rule 12(b)(6) standard." But that is because MoneyLion moved to dismiss the complaint or alternatively to compel arbitration. Dist. Ct. Dkt. No. 30. Naturally, MoneyLion invoked the Rule 12(b)(6) standard for its motion to dismiss and the summary-judgment-like standard for its motion to compel. *See* Dist. Ct. Dkt. No. 31 at 9-10. The district court denied both motions, SPA10, and now only the motion-to-compel denial is on appeal, JA188.

## II. PLAINTIFFS' CLAIMS ARE ARBITRABLE BECAUSE THEY DO NOT INVOLVE THE EXTENSION OF CREDIT

The MLA does not apply because Instacash advances are not extensions of "credit." "Credit" means "the right granted to a consumer

by a creditor to defer payment of *debt* or to incur *debt* and defer its payment." 32 C.F.R. § 232.3(h) (emphases added). MoneyLion users incur no debt because they have no obligation to repay advances. Plaintiffs' contrary arguments flout the statutory text and context.[2]

### A. Plaintiffs' Amorphous Reading Of "Debt" Disregards Text And Context

In the context of consumer contracts, "debt" means a legal or contractual obligation to pay a sum of money. OB22-28. Plaintiffs agree that "debt" means "a state of being under obligation to pay or repay someone." RB25 (citation omitted). And they concede that an "obligation" is "something that one is bound to do," RB26 (citation omitted), or "a binding promise," RB43 n.17 (citation omitted). Those

[2] For the first time on appeal, plaintiffs contend (at 21) that their "claims fall outside the scope of MoneyLion's arbitration agreement" altogether. They cite a provision in the agreement stating that it "will not apply to" servicemembers "with respect to any Claims concerning any of [MoneyLion's] lending products or services." JA72. But the agreement includes that provision because MoneyLion recognizes that the MLA bars arbitration of MLA disputes with servicemembers arising from MoneyLion's *actual* lending products, such as its Credit Builder Loans. Instacash is not one of those products. To the contrary, the Terms make clear that: "**INSTACASH IS NOT A LOAN. MONEYLION IS NOT LENDING YOU MONEY IN CONNECTION WITH THE INSTACASH SERVICE.**" JA132.

concessions are fatal to their arguments because Instacash users are not "bound" to pay *anything*. Plaintiffs' contrary position defies ordinary speech and common sense.

A consumer owes a debt only when they *must* pay it or else face consequences. By contrast, when a consumer receives money that they *need not* repay, they do not incur debt. They can simply walk away with the funds without facing any repercussions. In that circumstance, no one would say that the consumer has made "a binding promise" to repay. RB43 n.17 (citation omitted). Absent any enforcement mechanism, what would the source of the consumer's binding obligation be? Of course, when speaking colloquially, a friend who has benefitted from a favor might say, "I owe you one." But the Truth in Lending Act (TILA) and MLA involve consumer lending, and "debt" means "legal" or "contractual" obligations, not social or moral ones. 12 C.F.R. §§ 1026.2(a)(13), 1026.17(c)(1). Ultimately, plaintiffs' malleable interpretation of "debt" could harm consumers by emboldening debt collectors to recharacterize unwritten or non-legal obligations as "debt" subject to collection.

Resisting the ordinary meaning of "debt," Plaintiffs accuse (at 42) MoneyLion of selectively citing definitions of "debt" from *Black's Law*

*Dictionary*. To be clear, none of the definitions supports plaintiffs' view that "debt," as used in legal parlance, can mean a nonbinding "promise." RB43. And many of those definitions expressly support MoneyLion. For instance, one states that "[t]he word 'debt' carries with it the requirement of certainty, the foundation of promise by express contract, and necessarily implies legality." *E.g.*, *Debt*, Black's Law Dictionary (4th rev. ed. 1968) (*Black's*); *see id.* ("A debt is a legal liability to pay a specific sum of money." (quoting *Allen v. Dickson*, Minor 119, 120 (Ala. 1823))). Other definitions might not expressly reference a legal or contractual obligation to repay, but that is presumably because enforceability is so inherent to a "[a] sum of money due by certain and express agreement" that it need not be made explicit. *Id.*

Plaintiffs claim (at 42) that if Congress had wished to limit debts to legally binding ones, it would have referenced "[l]egal debts" rather than "debt." *See Legal debts*, Black's, *supra* (defining "[l]egal debts" as "[t]hose that are recoverable in a court of common law, as debt on … a simple contract"). But in statutes governing consumer-lending law and contracts—which address legal rights, requirements, and remedies—Congress had no need to include that "legal" qualifier because the

implication of legally enforceable debt is unmistakable from context. Such a construction does not "write 'a limitation into the statute that does not exist,'" RB36 (citation omitted); rather, it reads the statute in "context and with a view to [its] place in the overall statutory scheme," *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted).

Plaintiffs next attack MoneyLion for citing cases from outside "the consumer contract context" to support its common-sense reading of "debt." RB44; *see* OB25-26. But those cases underscore that, across a variety of financial regulatory schemes, "debt" means an enforceable payment obligation. As this Court recently affirmed, if a creditor "could never sue" a debtor or "obtain *any* affirmative relief" against its property, "it has 'no right to payment'" under bankruptcy law. *In re SVB Fin. Grp.*, __ F.4th __, 2026 WL 2648091, at *5 (2d Cir. Sept. 9, 2026) (citation omitted); *see Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990). And in *Powell v. Ocwen Financial Corp.*, 173 F.4th 386 (2d Cir. 2026), this Court characterized the "classic debt" as "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest." *Id.* at 394 (citation omitted); *see Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43-44 (2d

Cir. 2012) (similar). That definition plainly supports MoneyLion—and it is immaterial that the Court found a debt on the specific facts there. *Contra* RB44. Plaintiffs offer no principled reason why "debt" would have one meaning under the securities laws, Employee Retirement Income Security Act, Bankruptcy Code, and Tax Code—and an entirely different one under TILA and the MLA.

Nor do plaintiffs have any sound response to MoneyLion's state-law authorities. OB26-27. They call those authorities "idiosyncratic" without offering any countervailing state-law decisions of their own. RB46. And while they insist that "the MLA preempts inconsistent state law," *id.*, they disregard that state law can help illuminate the meaning of undefined federal-law terms like "debt." Recognizing as much, the MLA Rule expressly states that "[w]ords that are not defined in this [Rule] or Regulation Z … have the meanings given to them by *State* or Federal law." 32 C.F.R. § 232.3(s) (emphasis added).

Tellingly, the only cases that plaintiffs cite to support their novel understanding of "debt" are the recent district court decisions addressing EWA. RB32. But plaintiffs' overwhelming reliance on those cases highlights the weakness of their position: If statutory references to "debt"

can encompass any nonbinding indication that a person will pay—even absent any legally binding obligation—then presumably some court would have said so before 2025. In any event, as the opening brief explains, the cited district court decisions are unpersuasive on their own terms. OB34-47.

### B. Users Incur No Debt To MoneyLion Because They Have No Obligation To Repay Any Advance

Under the correct understanding of "debt," this case is straightforward: MoneyLion users incur no debt because they have no legal or contractual obligation to repay advances. OB28-31. MoneyLion's Terms could not be clearer: "**THERE IS NO OBLIGATION TO REPAY AN INSTACASH ADVANCE.**" JA132; *see* JA136 (same). They "warrant[] that [MoneyLion] has no legal or contractual claim against [a user] based on [their] failure to repay in full an Instacash Advance, including any Turbo Fees and Tips associated with any Instacash Advance." JA136. And they explain that MoneyLion will not "engage in any debt collection activities"; will not "place" unpaid amounts with a debt collector; and will not "report to a consumer reporting agency concerning an Instacash Advance." *Id.* The *only* effect of nonpayment is

that MoneyLion "will not provide [the user] with further Instacash Advances" until repayment is made. *Id.*

Plaintiffs concede (at 33) that the "question is whether Instacash [users] took on an obligation to repay their advances." Based on the Terms just quoted, the answer is clearly no. Plaintiffs seek to distract from that straightforward analysis by advancing a series of flawed arguments. First, they conflate *how* a consumer can repay an advance with a *requirement* that they repay. Second, they assert that MoneyLion somehow retains recourse even though its Terms unambiguously say otherwise. Third, they claim that because Instacash shares superficial similarities with a loan, it must be a loan.

#### 1. A revocable debit authorization does not create a repayment obligation.

Plaintiffs contend that they incurred debt to MoneyLion because they supposedly made "a 'certain written promise to pay money' to MoneyLion on the repayment date." RB30 (citation omitted). That is wrong. As the opening brief explains (at 30), the Terms simply require users who "choose to repay [an] Instacash Advance" to *initially* authorize MoneyLion to charge their linked card or debit their account. JA137.

The initial authorization provides for convenient electronic repayments as long as a user wishes to continue using the service. But when users "no longer wish to repay," they may "[r]evoke [their] payment authorization by … [r]emoving [their] payment method in the MoneyLion app" or contacting customer support. JA186; JA138. And critically, doing so does not give rise to a "legal or contractual claim"—nor could it, because there is "no obligation to repay an Instacash Advance." JA145 (capitalization omitted).

The Terms thus make clear that revoking the payment authorization is consistent with, not a breach of, the parties' contract. When users choose to initially authorize automatic debits, they have the corresponding contractual right to "withdraw" that authorization before paying the next advance, without consequence, JA138—just like any consumer who inputs their credit card information to receive a free trial can revoke that payment authorization before the subscription begins. Plaintiffs are therefore flatly wrong to assert that "[e]ach Instacash advance necessarily entails a 'duty,' 'written promise,' and 'binding agreement or acknowledgement' to pay money." RB33-34. In fact, each advance simply entails an initial payment authorization that can be

freely revoked—and if revocation occurs, MoneyLion cannot collect the unpaid amount. That is just a convenient way to process *voluntary* payments.

Notably, plaintiffs' lengthy description (at 31) of the payment authorization process omits the revocation option entirely. But it is black-letter law that "[a]ll the provisions of a contract must be construed together." *SE Prop. Holdings, LLC v. Bank of Franklin*, 280 So. 3d 1047, 1052 (Ala. 2019) (alteration in original) (citation omitted). Plaintiffs cannot claim an obligation to repay by selectively citing *only* the payment-authorization provision while ignoring the payment-revocation provision.

Plaintiffs note (at 6) that MoneyLion may "make repeated collection attempts should the pre-authorized repayment method fail." But MoneyLion may reattempt a debit only if the user has authorized it—and the user may revoke that authorization at any time, at no cost. JA138. Reattempting an authorized debit is simply voluntary payment processing the user can end unilaterally. And if payment never comes, MoneyLion has only one response: declining further advances. JA136.

Plaintiffs also assert (at 7) that "[g]iven the short duration of Instacash [advances] … the [three-day] notice requirement makes revocation unnecessarily difficult, if not impossible." *See* JA138. But plaintiffs do not allege that this three-day period prevented them revoking authorization prior to a scheduled payment. Nor do plaintiffs offer evidence that other users have had difficulty revoking. A consumer could request and receive an advance on Monday and readily revoke her authorization on Tuesday, well in advance of a scheduled repayment on Friday.

Plaintiffs confusingly suggest (at 34) that they must have been "obligated to repay" because otherwise MoneyLion would have had no "right" "to debit [their] account[s]" and "would [have been] committing theft." But MoneyLion had a right to debit plaintiffs' accounts so long as they authorized such debits. If they revoked their authorization, MoneyLion would no longer have that right or any recourse to collect the unpaid advance.

### 2. MoneyLion has no recourse if a user chooses not to repay an advance.

Notwithstanding the clear language of the Terms, plaintiffs insist (at 36) that MoneyLion "retains" recourse. None of plaintiffs' asserted "layers of repayment enforcement" exist. *Id.* First, as explained above, there are no "mandatory" pre-authorized debits. *Id.* Instead, all pre-authorized debits are freely revocable without consequence. Second, every "re-attempt collection debit[]" likewise operates exclusively through user consent. RB37; *see supra* at 14. Third, MoneyLion does not "enforce[]" repayment by disallowing further advances until a user repays a current one. RB36. That policy simply reflects MoneyLion's wish to limit its losses precisely because unpaid advances are uncollectible. Not being able to access a *future* advance says nothing about whether a user has to repay the *current* one.

Lacking support in the Terms, plaintiffs ask the Court to assume that "recourse" exists based on the high repayment rate alleged in the Complaint. RB37 n.14. But just because many users choose to repay does not mean they *must* do so. Instead, the obvious inference is that users repay because they want to continue using Instacash. OB42. As

plaintiffs acknowledge (at 55), the relevant question is whether users have "an enforceable repayment obligation." Only the Terms could create such an obligation, and they do not.

#### 3. Instacash is a no-recourse, no-obligation service in both form and substance.

Plaintiffs retreat to asking this Court to "look[] past the form of the transactions to their economic substance." RB39 (citation omitted) (alteration in original). But Instacash is not credit in either form or substance. Plaintiffs never allege (nor could they) that MoneyLion's Terms are a sham or that MoneyLion actually seeks to collect unpaid advances. The service comes exactly as it is described: a cash advance with no obligation to repay.

Plaintiffs' insistence (at 39) that the MLA "should be liberally construed to achieve its purposes" is the "last redoubt of losing causes." *Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135 (1995). "The best evidence of [congressional] purpose is the statutory text." *W. Va. Univ. Hosp. v. Casey*, 499 U.S. 83, 98 (1991). In any event, plaintiffs offer no reason why their interpretation would better "protect consumers" than MoneyLion's.

RB39. EWA provides a consumer-friendly alternative to riskier payday loans. Unlike payday loans, EWA does not create debt traps because users have no obligation to repay, no ability to roll over advances, and can incur no penalties. Amicus Br. for Am. Fintech Council et al. 11-15. If EWA were treated as credit (as plaintiffs suggest), that would harm consumers because advances would be collectible as debt—subjecting users to the very debt traps that EWA is designed to avoid.

### C. Agency Interpretations And Analogies To Other Products Confirm That Instacash Is Not Credit

Because the text unambiguously shows that Instacash is not credit, this Court need not consider agency interpretations. *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). Regardless, the only relevant agency interpretation confirms the conclusion. Based on the statutory text and context, the CFPB's 2025 AO determines that EWA is not credit because it creates no "financial liability or obligation" to repay, and providers "reserve no recourse." 90 Fed. Reg. 60069, 60071-72 (Dec. 23, 2025). Plaintiffs observe that the AO formally addresses only "Covered EWA," where "[r]epayment occurs through 'a payroll process deduction.'" RB47 (quoting 90 Fed. Reg. at 60071). But the AO's "primary reason" for

deeming Covered EWA non-credit is that it entails no "financial liability or obligation" to repay, 90 Fed. Reg. at 60071—a rationale that applies equally to Instacash.

As plaintiffs note (at 48-49), the AO also states that "the defining element of 'credit' is a consumer's repayment—at some point in the future—of the amount owed." 90 Fed. Reg. at 60072. But absent contrary indications, the ordinary meaning of "owe" is "to be under obligation to pay or repay in return for something received." *Owe*, Merriam-Webster Online, https://perma.cc/LN25-GHVH. Thus, plaintiffs' favorite line of the AO only reinforces that "credit" entails an obligation to repay.

Plaintiffs misconstrue the AO as suggesting that the existence of "debt" hinges on whether voluntary repayment is made "through 'a payroll process deduction'" or through "the consumer's regular transaction accounts." RB47 (citation omitted). In fact, the ordinary meaning of "debt" turns not on *how* payments are made, but on whether an obligation to pay exists. Nor does the "debt" question turn on technical details about whether EWA providers base eligibility for advances on the "'accrued cash value' of earned wages" or a user's history of "recurring

direct deposits." RB47. Instead, that question turns on whether users deemed eligible for advances incur an obligation to repay them.

Rather than the AO, plaintiffs invoke (at 27-29, 32) interpretations by the Federal Reserve Board (FRB) and Department of Defense (DoD) addressing *different* financial products. But plaintiffs never explain why those interpretations override the CFPB's recent analysis of the very service at issue. Nor do plaintiffs explain how a court could give "deference" to the FRB's interpretation. RB27-28 n.9 (citation omitted). The cited staff commentary does not even grapple with the ordinary meaning of the term "debt." *See* 12 C.F.R. pt. 1026, Supp. I, Para. 2(a)(14) ¶ 2. And after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), this Court must "independently determine the 'best reading'" of that language, *Wong v. Blanche*, __ F.4th __, 2026 WL 2416711, at *1 (2d Cir. Aug. 19, 2026) (citation omitted).

Plaintiffs' regulatory authorities are also inapposite on their own terms. Each product addressed involves some sort of enforceable obligation to repay. For instance, the FRB commentary addresses agreements, "however they are described," that share the fundamental characteristics of "payday loans" or "deferred presentment transactions."

65 Fed. Reg. 17129, 17130 (Mar. 31, 2000). EWA does not fall into that category. As already explained, it is critically distinct from payday loans.

Nor is it analogous to deferred-presentment transactions. OB43-44. Unlike EWA users, deferred-presentment borrowers cannot rescind their post-dated check and walk away without paying anything. In *Turner v. E-Z Check Cashing of Cookeville, TN, Inc.*, 35 F. Supp. 2d 1042 (M.D. Tenn. 1999), for instance, deferred-presentment borrowers "were required to sign Agreements providing that [they] would repay" the amount borrowed. *Id.* at 1046. Thus, when the plaintiff's post-dated check bounced, she breached the agreement, and the lender could have sued her to recover the unpaid sum. While the lender also impermissibly threatened the plaintiff with criminal prosecution, *see id.* at 1051, that is beside the point. *Contra* RB39.

Plaintiffs likewise err in analogizing (at 37) to secured transactions, such as mortgages, pawn transactions, and title loans. Those transactions involve an obligation to repay and an enforcement mechanism—seizure of the collateral—upon nonpayment. OB41-42. So while there is no "[r]ecourse against the individual," RB37 (citation omitted), there is recourse against the property. Homeowners cannot

cancel their mortgage company's outstanding security interest and keep their home. Here, by contrast, users can cancel their debit authorization, keep an advance, and face no financial consequences.

Equally inapposite is DoD's treatment of "'deposit advance' products," which involve "credit extended" and then "repaid" with a "fee or charge … from funds available in the borrower's asset account held by that creditor." 80 Fed. Reg. 43560, 43579 (July 22, 2015); *see* RB29. Unlike EWA, deposit-advance products involve an express agreement to repay and recourse in the event of default. For instance, one deposit-advance agreement requires that consumers "Promise to Pay" and authorizes the lender to pursue any method "permitted by law to collect any outstanding debts." Fifth Third, *Terms & Conditions Applicable to Fifth Third MyAdvance* 6-7 (Aug. 10, 2026), https://perma.cc/95HZ-8FWS. Moreover, if a deposit-advance customer fails to repay, the creditor may "execute a *forced repayment* from the consumer's deposit account for the amount due, even if this causes the account to become overdrawn." CFPB, *Payday Loans and Deposit Advance Products* 12 (Apr. 24, 2013), https://perma.cc/6BX8-JKBV (emphasis added).

## III. PLAINTIFFS' CLAIMS ARE ALSO ARBITRABLE BECAUSE ADVANCES ARE NOT SUBJECT TO A FINANCE CHARGE

The MLA's arbitration bar does not apply here for another, independent reason: MoneyLion's advances are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). A finance charge is a charge "imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). MoneyLion does not "impose" express delivery fees or tips on users because those fees and tips are entirely optional; nor are such fees or tips "incident to" advances. That conclusion is confirmed by the CFPB's AO, which squarely determines that optional express delivery fees and tips are not finance charges.

Plaintiffs do not offer any argument that tips are finance charges. *See* RB56-72. They have therefore forfeited that argument. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). And plaintiffs' arguments concerning express delivery fees lack merit.

### A. Optional Express Delivery Fees Are Not "Imposed" By MoneyLion On Users

MoneyLion's express delivery fees are optional, so they are not "imposed." As common dictionaries, legal dictionaries, and case law show, "imposed" means "appli[ed] as compulsory." *Impose*, Webster's

Seventh New Collegiate Dictionary 420 (1967); *see* OB44-45. Thus, a charge is "imposed" by a creditor on a consumer only if the creditor requires the consumer to pay it to obtain the credit. For instance, a mortgage lender may "impose" an origination fee on a home buyer because the buyer could not obtain the mortgage without paying that fee. But if the buyer chooses to pay an optional fee to rush the underwriting process, no one would say that the lender has "imposed" that fee on the buyer.

Plaintiffs first try to read the word "imposed" out of the statute and regulation. They claim that "Regulation Z broadly defines 'finance charge' as reaching '*any* charge' made '*incident to*' a particular extension of credit." RB57. But that is not what the definition says. Instead, it encompasses only charges "*imposed* … as an incident to the extension of credit." 15 U.S.C. § 1605(a) (emphasis added).

Stuck with the text as written, plaintiffs maintain that in the "context" here, "imposed" merely "identifies the party conducting the charging" and "establish[es] a counterpoint" to the phrase "*payable* by the borrower." RB57 (citation omitted). But even if the term "imposed" helps identify the party levying the charge, that would not provide an excuse

for disregarding the term's ordinary meaning. If Congress's only objective had been identification, it could have used the term "charged"—which encompasses optional fees. *See Charge*, Webster's New Twentieth Century Dictionary 288 (1965) ("[t]o make *or ask* as a price" (emphasis added)). Or it could have simply referred to "any charge payable directly or indirectly by the consumer as an incident to the extension of credit," without mentioning the creditor at all. Instead, it deliberately chose a term—"imposed"—that "connotes the affirmative placement of a burden or a restriction." *United States v. Martin*, 974 F.3d 124, 138 (2d Cir. 2020).

Plaintiffs also contend (at 57) that express delivery fees are "imposed" because they must be "paid to obtain the instant-use feature of Instacash." That contention is circular: MoneyLion of course imposes express delivery fees incident to the express-delivery feature. But the relevant question is whether MoneyLion "impose[s]" express delivery fees "as an incident to *the extension of credit*." 15 U.S.C. § 1605(a) (emphasis added). And the putative "extension of credit" here is an advance on a portion of already-earned wages, which a user can obtain without paying any fee. The "instant-use feature," RB57, simply changes the *speed* of

delivery—but the amount of the advance and other terms remain identical. A t-shirt shipped overnight and one shipped with standard 3-day delivery is still the same t-shirt. *See* OB58. Plaintiffs' "HBO Max" example (at 60) fails for the same reason. A "cable provider" may "impose" a fee for a premium channel if a customer chooses to access that channel. *Id.* But the cable provider does not "impose" that fee as an incident to the cable service itself because customers need not pay the fee to access basic cable. The same logic applies here.

Plaintiffs insist (at 60) that MoneyLion provides two different "credit offering[s]": one express-delivery advance and a separate "slower, fee-free advance." But as the CFPB has explained, that view is "facially implausible" because it would mean that "any fee for anything connected to a credit transaction can be transformed into a finance charge" simply by deeming "each 'feature'" a "separate credit product." 90 Fed. Reg. at 60075 (citation omitted). Under the correct analysis, the Court must focus on the putative extension of credit itself—which here is an advance of funds well before a user's ordinary payday. The marginal difference between a few hours and a few days does not create an entirely distinct "credit offering." RB60. The advance remains valuable to a consumer

needing early access to their wages during the ordinary 14-day pay period.

Plaintiffs' reliance (at 60 n.23) on "[s]tate statutes" using the term "imposed" is misplaced. Those laws describe express delivery fees as being "imposed" for the delivery, not "as an incident to the extension of credit." *See* Ark. Code Ann. § 23-52-202(7)(A) ("'Fee' means a charge imposed by a provider for delivery or expedited delivery of proceeds to a consumer.").[3] If a user has chosen to expedite delivery, the putative creditor may be described as "impos[ing]" a fee for that delivery, because the borrower cannot receive the faster delivery without paying the fee. But the putative creditor has not "imposed" the fee for "the extension of credit" because the user was not required to expedite delivery in the first place.

### B. Plaintiffs Misconstrue The Phrase "Incident To"

MoneyLion's express delivery fees are also not imposed "incident to" an extension of credit. OB52-54. Plaintiffs admit that the phrase

---

[3] *See* Kan. Stat. Ann. § 9-2402(i) (similar); S.C. Code Ann. § 39-5-820(7)(a) (similar); Utah Code Ann. § 13-78-101(5)(a) (similar); Nev. Rev. Stat. § 604D.100(1)(a) (similar).

"incident to" "implies some *necessary* connection" between the relevant charge and the extension of credit. RB61 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 241 (2004)). Here, there is no necessary connection between an express delivery fee and an advance. Users can obtain the same advance in the same amount by selecting free standard delivery. And even if users choose express delivery, they can still receive the advance on an expedited timeframe without paying any fee by cancelling the entire repayment—the advance *and* the express delivery fee. *See* JA136.

Plaintiffs nonetheless insist that a "necessary connection" exists because "[n]o user pays the fee without taking an Instacash advance." RB61. But the same was true in *Pfennig*. There, no consumer would have paid the relevant over-limit fee without taking an extension of credit—and yet the Court held that "the best interpretation of the term 'finance charge' may exclude over-limit fees." *Pfennig*, 541 U.S. at 242.

Plaintiffs posit (at 62) that "necessary connection" merely implies that "a *connection* between the fee and the extension of credit must exist." But if every fee with "a connection" to the extension of credit were a finance charge, then the meaning of finance charge would be boundless.

Such a reading cannot be squared with the terms of TILA and Regulation Z—which enumerate examples of both finance charges and fees that are not finance charges. *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(b).

Plaintiffs also cannot reconcile their position with *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996). They incorrectly suggest that *Pfennig* abrogates *Veale* by "requir[ing] only a 'connection'" of any kind between the fee charged and credit extended. RB70 (quoting *Pfennig*, 541 U.S. at 241). But in fact, *Pfennig* requires a "*necessary* connection between" the two. 541 U.S. at 240-41. And *Veale* tracks the necessary-connection standard by holding that an optional express delivery fee that "the borrower can choose to avoid" is not a finance charge. 85 F.3d at 579.

Nor is *Veale* "distinguishable." RB70. Plaintiffs note that the consumers in *Veale* paid a fee for funds to be delivered "to some other creditor to whom [they] owed money." RB71 (citation omitted). But there, as here, payment of the optional fee accelerated access to the use or value of money—whether through direct receipt of funds or a transfer of funds to pay off an existing debt. And because in both cases, the consumer "could have chosen not to pay the [express delivery] fee and the

[putative creditor] did not require it," the fees are not finance charges. *Veale*, 85 F.3d at 579.

Plaintiffs err (at 65) in emphasizing the "disjunctive" nature of Regulation Z's finance charge definition, which references charges that are "imposed … as an incident to *or* a condition of the extension of credit." 12 C.F.R. § 1026.4(a) (emphasis added). As the opening brief explains (at 53), only the regulation—not the statute—uses the disjunctive formulation. The statute references charges "imposed … by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). Plaintiffs ignore this point. As a result, they impermissibly read Regulation Z's addition of the phrase "or a condition of" to "rewrite" the "clear statutory" language of "incident to." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Read properly, Regulation Z's addition of "or a condition of" reinforces that "incident to" captures only fees that must be paid as a condition of obtaining the extension of credit.

Plaintiffs' emphasis (at 68-69) on MoneyLion's "promot[ions]" fares no better. The quoted marketing materials advertise speed, and speed is all the express delivery fee buys. Regardless, MoneyLion's Terms—to which plaintiffs agreed—supersede any other terms governing Instacash,

including descriptions of the product in advertisements. *See* JA132. Likewise, their miscellaneous allegations (at 9, 11) about how MoneyLion "steers customers toward paying" express delivery fees, "fail[s] to clearly disclose the fee," and "maximize[s] the number of advances taken" are irrelevant to the legal question here: whether express delivery fees are "imposed … as an incident to the extension of credit."

### C. Other Interpretive Tools Confirm That Express Delivery Fees Are Not Finance Charges

Statutory structure reinforces that express delivery fees are not finance charges. OB56-57. None of the finance charges listed in TILA or Regulation Z resemble optional fees paid to expedite delivery of credit. Plaintiffs cite "[c]redit life and disability insurance premiums." RB58 (citation omitted). But those premiums "may be *excluded* from the finance charge" when they are "[v]oluntary" and "[t]he insurance coverage is not required by the creditor." 12 C.F.R. §§ 1026.4(d)(1), (d)(1)(i) (emphasis added). Thus, making the premiums voluntary is precisely what allows a creditor to remove them from the category of "finance charges."

Nor does the MLA's definition of "interest" change the answer. *Cf.* RB58-59. Because the arbitrability question turns on whether Instacash is "consumer credit," 10 U.S.C. § 987(f)(4), the pertinent question on appeal is whether express delivery fees are finance charges, 32 C.F.R. § 232.3(f)(1); *see* SPA7-8. The MLA Rule defines "finance charge" to have "the same meaning as 'finance charge' in Regulation Z," 32 C.F.R. § 232.3(n)—which implements TILA, not the MLA. In turn, Regulation Z's definition of "finance charge" does not incorporate the MLA's definition of "interest." *See* 12 C.F.R. § 1026.4. Thus, Regulation Z's reference to "[i]nterest" is best read to track the ordinary meaning of that term, which excludes express delivery fees. *Interest*, Merriam-Webster Online ("a charge for borrowed money generally a percentage of the amount borrowed").

Agency guidance confirms what the statute requires. The CFPB's AO concludes that optional express delivery fees "are not 'directly or indirectly imposed' by the provider," and so cannot qualify as a "finance charge." 90 Fed. Reg. at 60075. And that conclusion applies even to "EWA products other than [payroll-based] Covered EWA." *Id.* at 60074. Plaintiffs insist (at 68) that the AO is inconsistent with "the allegations

here." But the AO specifically considers EWA services that "offer consumers the option of receiving their earned wages via regular ACH and/or by instant transfer" for a fee. 90 Fed. Reg. at 60074-75. That describes MoneyLion's service. JA168.

Nor do plaintiffs offer any persuasive response to the FRB's rule finding that "a fee for expedited delivery of a credit card is not incidental to the extension of credit and thus is not a finance charge." 68 Fed. Reg. 16185, 16187 (Apr. 3, 2003). Plaintiffs seek to distinguish (at 69) between "shipping a physical credit card via express mail" and electronically transferring cash via express delivery. But in both circumstances, users can pay an optional fee to access funds more quickly. Plaintiffs also note (at 69) that "[w]hether a consumer receives a physical credit card in two days or two weeks does not alter any term of the credit extended." The same is true here: regardless of whether users opt for standard or express delivery, they receive the same advance in the same amount and may defer or decline repayment with no consequence.

Rather than these on-point authorities, plaintiffs again rest on agency interpretations addressing distinct products. RB64-65. First, they analogize to debt-cancellation agreements, under which a creditor

charges a fee to "cancel all or part of any remaining debt in the event of an occurrence, such as the death, disability or unemployment of the borrower." 61 Fed. Reg. 49237, 49240 (Sept. 19, 1996). But as the AO explains, those fees involve "a very different fact pattern" because paying them "potentially reduces the principal amount the consumer owes the creditor." 90 Fed. Reg. at 60075. In contrast, the base "amount [an EWA] provider deducts" from a user's bank account (if the user chooses to repay) "is unaffected by the [user's] opting for expedited delivery" or "instead for free ACH delivery." *Id.*

Second, plaintiffs analogize to "variable-rate loans," RB64 (citation omitted), where the borrower can pay a fee "to convert the loan to a fixed interest rate at a subsequent date," 61 Fed. Reg. at 49239. But paying such fees allows borrowers to "alter[] the fundamental nature of [their] repayment obligation." *Id.* So even if they are properly considered finance charges, they are nothing like express delivery fees—which do not affect users' repayment obligations.

Finally, plaintiffs fall back (at 64) on district court decisions from the EWA context finding optional express delivery fees to be finance charges. Those decisions are nonbinding and squarely conflict with the

CFPB's AO. They also rest on the same flaws as plaintiffs' own response brief. *See* OB60-61. Accordingly, plaintiffs' consistent refrain about "every other court" adopting their interpretation falls flat. RB64.

## IV. THE MLA DOES NOT BAR ARBITRATION OF PLAINTIFFS' NON-MLA CLAIMS

At minimum, the district court should have compelled arbitration of plaintiffs' TILA and state-law claims.[4] Plaintiffs' contrary position (at 72-73) depends on a surprising premise: that the MLA bars enforcement of agreements to arbitrate consumer-credit disputes arising under statutes *other than* the MLA. But plaintiffs cite nothing in the MLA's text, context, or history suggesting that it is a super-statute barring arbitration of disputes across all of federal and state law. And the MLA Rule makes clear that the arbitration bar applies only to consumer-credit disputes "pursuant to this part," 32 C.F.R. § 232.9(d)—not to every consumer-credit dispute pursuant to every law. Plaintiffs assert (at 73)

[4] Contrary to plaintiffs' suggestion (at 22), MoneyLion did not concede that Section 987(f)(4) would preclude arbitration of plaintiffs' TILA and state-law claims. The language plaintiffs quote did not concern Section 987(f)(4); it addressed only the distinct issue of the Arbitration Agreements' carveout for Covered Borrowers. *See* Dist. Ct. Dkt. No. 31 at 37.

that the MLA Rule is referencing disputes involving credit transactions "expressly exclude[d]" by the MLA. But they never explain why it cannot *also* be referencing disputes involving credit transactions arising under other laws entirely.

Plaintiffs' position is so sweeping that it would preclude arbitration of disputes even if a servicemember did not raise an MLA claim. Suppose, for instance, that a servicemember brings a slip-and-fall suit against a bank after injuring himself when entering the bank while taking out a loan. Under plaintiffs' view, the servicemember's tort case cannot be arbitrated—even if the parties agreed to do so—because the case arguably "involve[s] the extension of consumer credit." And that would be true even if the servicemember did not bring an MLA claim. Had Congress intended such a counterintuitive result, it would have said so clearly. *Cf.* 9 U.S.C. § 402(a) (barring enforcement of arbitration agreements "with respect to a *case*" in which a person "alleg[es] *conduct* constituting a sexual harassment dispute" (emphases added)). Congress said nothing of the kind in Section 987(f)(4).

## CONCLUSION

This Court should reverse the district court's order denying MoneyLion's motion to compel arbitration.

Dated: September 10, 2026

Respectfully submitted,

*<u>/s/ Ephraim A. McDowell</u>*

EPHRAIM A. MCDOWELL
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

JAMES KIM
KAITLAND M. KENNELLY
HUGH B. HAMILTON
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

JONATHAN Y. ELLIS
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
(919) 755-6688

GRACE GREENE SIMMONS
MCGUIREWOODS LLP
1075 Peachtree Street, NE
35th Floor
Atlanta, GA 30309
(404) 443-5718

*Counsel for Defendant-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation set forth in Local Rule 32.1(a)(4)(B) because it contains 6,994 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: September 10, 2026

*/s/ Ephraim A. McDowell*
Ephraim A. McDowell

## CERTIFICATE OF SERVICE

I hereby certify that, on September 10, 2026, I electronically filed the foregoing Reply Brief of Defendant-Appellant MoneyLion with the United States Court of Appeals for the Second Circuit using the Court's electronic filing system, which will serve copies on all registered counsel.

Dated: September 10, 2026

*/s/ Ephraim A. McDowell*
Ephraim A. McDowell